**William B. FLAHERTY**

v.

**The UNITED STATES.**

No. 188–78.

United States Court of Claims.

Dec. 12, 1979.

John I. Heise, Jr., Silver Spring, Md., attorney of record, for plaintiff. John P. Rhody, Jr., Silver Spring, Md., of counsel.

Richard J. Webber, Washington, D.C., with whom was Acting Asst. Atty. Gen., Alice Daniel, Washington, D.C., for defendant. Michael J. Riselli, South Boston, Mass., of counsel.

Before DAVIS, KUNZIG and BENNETT, Judges.

### ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

DAVIS, Judge.

Once again we are called upon to consider the pay of an employee of the Internal Revenue Service on his return from a foreign tour of duty under the Foreign Tax Assistance Program (FTAS). In *Whelan v. United States*, 529 F.2d 1000, 208 Ct.Cl. 688 (1976), and *Carrasco v. United States*, 215 Ct.Cl. 19 (1977), we ruled that, under the then controlling Revenue Service regulation, the employees were entitled on their return to IRS compensation no less than

they received in their foreign assignments.[1] We take a contrary position in the present case because of the different circumstances of this plaintiff's fourth foreign assignment (at issue here) and his return from that tour to the Service.

Plaintiff began his first limited assignment to the FTAS (now called the Tax Administration Advisory Service, TAAS) on January 1, 1967, when he was an IRS employee at grade GS–13, step 5. His second consecutive assignment followed in January 1969, then a third consecutive assignment in July 1971, and a fourth in January 1974. All these assignments were voluntarily undertaken, with plaintiff's concurrence and at his desire. During the four assignments his salary under the FTAS program rose so that, at the time of his return in November 1975 to domestic service with IRS, his salary with FTAS was equivalent to that of a GS grade 16.

When he came back at the beginning of November 1975 he was given a position, not at grade GS–15 or GS–16, but at GS–13, step 10, for one day, and was then immediately promoted to a grade GS–14, step 10. Under the so-called Salary Retention Act, Pub. L. 92–392, 86 Stat. 564, 569, formerly 5 U.S.C. § 5345, he continued for two years to receive the last salary (equivalent, as we have said, to a grade GS–16) he had had under FTAS, but on expiration of that two years (in November 1977) his salary was reduced to that of a GS–14, step 10. He now sues for the difference in pay since November 1977, invoking *Whelan* and *Carrasco*. The case comes before us on cross-motions for summary judgment.

We reach a different result from those in *Whelan* and *Carrasco* because of the combination of three factors which separate plaintiff Flaherty from that of the IRS employees to whom we earlier granted relief: first, the IRS regulations on which we relied in *Whelan* and *Carrasco* apply only to the first two assignments abroad, while plaintiff's claim is for the equivalent of his salary at the end of his fourth assignment; *second*, before his fourth assignment plaintiff was explicitly informed in writing that on his return to domestic service he would have only reemployment rights to a GS–13 position; and, *third*, before Flaherty's return to the IRS in November 1975 the controlling IRS regulation had been amended to delete the provision granting such returning employees the pay equivalent to that they were earning under FTAS. We consider in turn each of these interconnected bases for denying plaintiff's claim.

1. In *Whelan* and *Carrasco* we rested our decisions directly on § 183(10).9(2) of the Internal Revenue Manual which declared (in relevant part):

> Upon termination of assignments to FTAS, employees returning to the General Schedule (GS), who have satisfactorily completed overseas tours of at least one year, will have new GS salaries established on the basis of the salary of the highest FC grade [*i. e.*, grade in the FTAS] held for one year. Should an employee's current FC salary fall between two GS step rates, the employee will be given the higher GS step.

The immediately preceding section of the Manual, § 183(10).8, headed "Reemployment Rights," grants returning FTAS employees reemployment rights to their old or comparable positions, but paragraphs (1) and (2) of the section limit those rights to the first and second consecutive overseas assignments.[2]

We read the two sections of the regulation together as covering the same employees, and only for the first two consecutive assignments. Section 183(10).8, as its heading shows, grants reemployment rights for

---

1. In *Carrasco*, however, we held on rehearing that a returning employee could not receive the salary of a supergrade position. 215 Ct.Cl. 1044 (1978).

2. Paragraph (1) declares reemployment rights "for up to 30 months" and adds that the Service has administratively extended these statutory rights "during the first overseas tour" to include local commuting areas. Paragraph (2) then says: "Employees who receive a second consecutive overseas assignment are administratively granted the same reemployment rights as in (1) above" (with an irrelevant exception).

the first two foreign assignments; the very next section, § 183(10).9, headed "Procedures for Returning Employees from FTAS," prescribes how these reemployment rights are to be implemented, including the pay provision (subparagraph (2)) on which the court relied in the two earlier decisions. This was the way IRS interpreted the regulations. In the letter plaintiff received prior to his fourth assignment (see n. 4, infra), the Director of the Personnel Division pointed out to him that "the IRS Manual is silent with respect to reemployment rights after the second limited assignment," and also indicated that in granting him limited reemployment rights after his fourth assignment the Service was acting administratively.[3]

Plaintiff would have us read the two sections as unconnected, the first (§ 183(10).8) as concerned solely with the "positions" or locations to which returning employees could be reinstated, while the second (§ 183(10).9) covered only the subject of pay, unrelated to reemployment in a position or at a location, and not limited in its terms to the first two assignments. This seems to us far too strained a reading of the two provisions which are obviously in pari materia; indeed, the first subparagraph of § 183(10).9 unmistakably deals with reemployment in a position.

We do not know the reasons which may have moved the Internal Revenue Service to limit its regulations to the first two foreign assignments, but it would not be unreasonable for the agency to conclude that, although it wanted to encourage FTAS volunteers by adopting § 183(10).9 (see Carrasco v. United States, supra, 215 Ct.Cl. at 28, 31), at the same time it would like to be able to control overly-long service abroad through the mechanism of individual agreements such as was made in this case (see n. 4, infra, and part 2, infra).

2. As we have already suggested, before plaintiff departed on his fourth tour abroad he received a memorandum from the Director of the Personnel Division telling him precisely what reemployment rights he would have on his return from the fourth assignment.[4] He was to have reemployment rights to a GS–13 position. To us this can mean nothing else than that plaintiff would be entitled to the pay of a GS–13 position—and no more. Plaintiff says that the memorandum did not limit him to a GS–13 grade; this is true in the sense that IRS could give him a higher grade it if wished, but the memorandum certainly gave him the right to nothing higher than grade 13 pay.

We are also told, again, that position and pay are entirely separate, and that the memorandum relates to position (and the location of the position), not in any way to pay. This seems to us an impossible reading of the memorandum which informed plaintiff, first, that the Manual provisions did not cover his case; second, that as an administrative matter his reemployment

3. In the absence of a regulation or an administrative agreement, reemployment would be governed by 22 U.S.C. § 928, the statute pertaining to the reemployment of Foreign Service reserve officers assigned abroad from a government agency. This provides for reinstatement "in the same position he occupied at the time of assignment, or in a corresponding or higher position," and for receipt of "the within-grade salary advancements he would have been entitled to receive had he remained in the position in which he [was] regularly employed * *." (It is noteworthy that when plaintiff left for his first assignment in 1967, § 183(10).9(2) was not yet in effect.)

4. This memorandum, dated October 24, 1973, and headed "Reemployment Rights," reads:

The Acting Director, TAAS, tells me that you would like to return to Paraguay for another limited assignment, after completion of home leave, provided you receive an extension of your reemployment rights within the IRS.

Although the IRS Manual is silent with respect to reemployment rights after the second limited assignment, I am pleased to inform you that the Service will grant you administrative reemployment rights for your next limited assignment.

The Regional Commissioner, Central Region, has agreed to extend your reemployment rights to a GS–13 position upon completion of your fourth consecutive assignment.

Therefore, upon completion of your new limited assignment, you will have reemployment rights to a GS–13 position within the Central Region.

rights would be extended; and, third, that on completion of his new (fourth) assignment he would have reemployment rights as a GS–13. It does not make sense to read this memorandum as requiring plaintiff to be paid, on his return, at a level higher than a GS–13. And we do not believe that plaintiff could have reasonably understood that such was his right.[5]

Our reading of the memorandum, plaintiff says, means that by going on his fourth tour he unaccountably agreed to a reduction in pay since under *Whelan* and *Carrasco* he was already entitled, before that tour, to more money than the GS–13 level. The answer is, of course, that, until *Whelan* was decided on January 18, 1976, IRS did not read the regulations as this court later did—and it is very doubtful that affected IRS employees had anything more than a hope of higher pay. Moreover, the *Whelan* case was not even brought until 1974, and the IRS memorandum to plaintiff came in October 1973; if he was aware at all of the *Whelan* problem,[6] plaintiff may very well have believed that he would not be permitted to go on his fourth tour (which he wanted) unless he agreed to the IRS position on reemployment rights. We emphasize again, as the October 1973 memorandum reveals, that plaintiff's continuance in the FTAS program was wholly voluntary at all times.[7]

3. Plaintiff departed for his fourth assignment in January 1974 and returned in November 1975. On March 31, 1975, over six months before his return, §§ 183(10).8 and 183(10).9 of the Manual were revoked

and replaced by § 0352.3 which does not contain the language as to pay-on-return (quoted above) on which *Whelan* and *Carrasco* turned.[8] Defendant argues that, even if §§ 183(10).8 and 183(10).9 be held to apply beyond the second tour, this new regulation controlled plaintiff's pay on his return from the fourth tour even though it was not in effect when he left.

Textually the Government has support in the wording of § 183(10).9 which grants domestic pay rights *"upon termination of assignments to FTAS"* to employees, "who have satisfactorily completed overseas tours of at least one year," on their return to the General Schedule (GS) (emphasis added). Literally and grammatically, the regulation gives pay rights only upon return[9]—and the amendment of March 1975 was made half-a-year before plaintiff returned. The problem is, however, whether this literal reading should prevail or whether it is overcome by considerations of fairness or justice.

There is much learning as to the occasions in which pay or comparable monetary provisions may validly be altered *in medias res*, but it is neither necessary nor fitting to plow that field in this particular case. For this is a situation in which plaintiff had no reasonable expectation, when he left on his fourth assignment, of being paid by the IRS, on his return, the higher salary later mandated by court decree in *Whelan*. The memorandum of October 23, 1973 (discussed above) must have destroyed any such hope, if one existed. By the same token, the change in the regulations in March 1975

---

5. *See* note 6, *infra*.

6. The record does not reveal that plaintiff protested his slotting, on his return from his fourth tour, until several months after the *Whelan* decision in January 1976.

7. An affidavit by plaintiff summarily states that before his first FTAS tour (beginning in January 1967) he was assured that on his return to domestic service he "would receive the benefit of any promotions received and would *not lose pay*" (emphasis in original). No particulars are given, no names or positions of the persons who so assured him, and no dates. Such an undetailed and conclusory affidavit can be giv-

en little or no weight on these motions for summary judgment. In any event, this affidavit as to pre-1967 "assurances" has no substantial relevance to the fourth tour governed by the explicit memorandum of October 1973, *supra*, which plaintiff does not deny receiving.

8. The change in regulations may well have been triggered by the filing in 1974 of the *Whelan* case in this court.

9. In *Carrasco* the court said (215 Ct.Cl. at 28): "Upon termination of their FTAS assignments and return to IRS, plaintiffs became entitled to the benefit of the regulation."

could not have defeated any proper anticipation of this plaintiff. There is therefore no reason in fairness or justice for refusing to follow in this case the language of § 183(10).9 which suggests that no right to reemployment pay "vests" until the employee returns on completion of his foreign assignment. And it is agreed that under the new regulation there is no right to the *Whelan-Carrasco* level of pay.

For these reasons, taken together and in combination, we hold that plaintiff is not entitled to recover. Defendant's motion for summary judgment is granted and plaintiff's motion is denied. The petition is dismissed.