**Lisa Suzanne REDDISH, on behalf of her minor son, Christopher Eugene REDDISH**

v.

**SECRETARY OF THE DEPARTMENT OF HEALTH AND HUMAN SERVICES.**

No. 88–47V.

United States Claims Court.

Sept. 26, 1989.

Berry James Walker, Jr., Maitland, Fla., atty. of record, for petitioner. Robert D. Gatton, Maitland, Fla., M. Susan Sacco and Broad and Cassel, Miami, Fla., of counsel.

Respondent did not appear.

ORDER

MEROW, Judge.

Under the National Childhood Vaccine Compensation Program, 42 U.S.C. § 300aa–10, *et seq.* (Supp. V 1987), this matter comes before the court on the basis of the Report and Recommendation, filed August 15, 1989, of the assigned Special Master.

Under General Order No. 20, the petition in this matter was filed as of November 15, 1988. The petition seeks compensation for a profound sensorineural hearing loss alleged to have been caused by a Mumps, Measles and Rubella (MMR) vaccine administered on April 5, 1988 to Christopher Eugene Reddish, the then 16–months old son of petitioner Lisa Suzanne Reddish.

Pursuant to 42 U.S.C. § 300aa–12(c), Special Master E. LaVon French was designated to carry out the evidentiary functions authorized by the applicable legislation. A hearing was held and evidence received. Respondent chose not to appear in this matter, such that all the evidence presented was submitted by the petitioner. The material submitted did, however, include a Medical Review prepared by respondent's expert, Cynthia G. McCormick, M.D.

In the comprehensive report filed August 15, 1989, Special Master French's findings and conclusions of law are that Christopher Eugene Reddish sustained, or had significantly aggravated, a bilateral sensorineural hearing loss which was caused by a MMR vaccination administered on April 5, 1988 in Orlando, Florida, U.S.A., such that compensation is owed pursuant to 42 U.S.C. § 300aa–11(c)(1)(C)(ii)(I).

No objection to the Special Master's findings or conclusions of law has been filed and the time to so file has expired.

Accordingly, it is ORDERED:

(1) The report, including the findings and conclusions of law, filed August 15, 1989, is adopted by the court pursuant to 42 U.S.C. § 300aa–12(d)(2), and shall be attached hereto;

(2) Judgment shall be entered for the petitioner in the amount of $312,983, as provided in the following adopted report, with no additional costs to be awarded.

### REPORT AND RECOMMENDATION OF JUDGMENT[1]

Filed Aug. 15, 1989

E. LAVON FRENCH, Special Master.

This is an action for compensation for the vaccine-related injury of Christopher Eugene Reddish, brought by his mother, Lisa Suzanne Reddish, under the National Childhood Vaccine Injury Program, 42 U.S.C. § 300aa–10 *et seq.* (Supp. V 1987) (hereinafter the Vaccine Act or Act). Pursuant to § 300aa–12(c), and Vaccine Rule 18(a), and for the reasons cited below, the undersigned recommends to the assigned Claims Court Judge, Judge Merow, that judgment be entered for petitioner in the amount of $312,983, to be allocated as follows: $282,983 for future medical and rehabilitation expenses under § 300aa–15(a); $1,184.30 for projected pain, suffering, and emotional distress under § 300aa–15(a)(4); $1,184.30 for loss of future earnings under § 300aa–15(a)(3)(B); $17,297.50 for reasonable attorneys' fees under § 300aa–15(e); and $10,333.90, under § 300aa–15(e), for costs incurred in the prosecution of this petition.

### BACKGROUND

Lisa Suzanne Reddish claims that her minor son, Christopher Eugene Reddish (hereinafter Christopher), developed a severe to profound sensorineural hearing loss as a result of a Mumps, Measles and Rubella (hereinafter MMR) vaccination which was administered April 5, 1988. Since the vaccination was administered prior to October 1, 1988, petitioner's claim is a retroactive claim, i.e., filed prior to the effective date of the Vaccine Act and, therefore, is subject to any specific limitations in the Vaccine Act applicable to retroactive claims.

Hearing loss is not one of the conditions or reactions listed in the Vaccine Injury Table (hereinafter table), § 300aa–14. Petitioner does not disagree that hearing loss is an "off-table" condition or reaction. Petitioner asserts, however, that Christopher sustained such injury as the result of the MMR vaccine, and is entitled to compensation pursuant to §§ 300aa–11(c)(1)(C)(ii)(I) and 300aa–13(a)(1)(A) and (B).

Respondent alleges that Christopher's hearing loss was caused, not by the MMR vaccination, but by recurring ear infections suffered by Christopher, beginning at eight months of age. Respondent, therefore, challenges petitioner's entitlement to compensation under the Vaccine Act.

A hearing was conducted in this case on May 23, 1989 at the United States Federal Building, Room 600, Sixth Floor, 80 North Hughey Avenue, Orlando, Orange County, Florida. Present and appearing on behalf of the petitioner were Berry James Walker, Jr., and Robert D. Gatton. Respondent voluntarily elected not to attend the hearing either in person or telephonically. Witnesses appearing for the petitioner were Lisa Suzanne Reddish, Christopher's mother; Martha Janet Reddish, the maternal grandmother; Horace Dahl Reddish, the maternal grandfather; James F. Holly, MD; and Clifford Benjamin Dubbin, MD. The depositional testimony of W. David Carr, Christopher's treating pediatrician, was read into evidence on behalf of petitioner.

Prior to the hearing, petitioner agreed to stipulate into evidence any documentary evidence which respondent wished to have considered by the court. Respondent, however, declined to offer any evidence. As an accommodation, petitioner offered into evidence the Vaccine Injury Compensation Program (VICP) Medical Review, Case No.

---

1. This report may contain information that may not be disclosed to a nonparty. *See* 42 U.S.C. § 300aa–12 (1987). Accordingly, within fourteen (14) days of the date of filing this report, the parties shall designate any material subject to § 300aa–12 and such designated material will be deleted for public access. If on review of this report there are no objections filed within the fourteen (14) day period, then it shall be deemed that there is no material subject to § 300aa–12.

88–47V (hereinafter HHS Medical Review, or Medical Review) as part of petitioner's case in chief. Petitioner's Exhibit No. 19. The Medical Review was prepared for this case by respondent's expert, Cynthia G. McCormick, M.D.

The following issues have been presented to this court for resolution:

1. Whether Christopher Eugene Reddish sustained a sensorineural hearing loss as the result of the MMR vaccination administered on April 5, 1988;

2. Whether there was an intervening non-compensable cause of Christopher's hearing loss;

3. Whether Christopher Eugene Reddish is entitled to compensation under the Vaccine Act and, if so, the amount of compensation to be awarded; and

4. The amount to be awarded to petitioner's attorneys as a reasonable fee for their services, including the costs incurred by said attorneys in the prosecution of this claim.

## STATEMENT OF FACTS

The following facts are supported by the record. Christopher Eugene Reddish is a citizen of the State of Florida and of the United States of America. Transcript of May 23, 1989 hearing at 133, *Reddish* (No. 88–47V), (hereinafter Tr. at ____) and Petitioner's Exhibit No. 25 (hereinafter P.Ex. No. ____). Christopher was born to Lisa Suzanne Reddish on December 12, 1986 in Orlando, Orange County, Florida. The hospital records show no problems during delivery, birth, or the newborn period. P.Ex. No. 6, 8, and 9.

Christopher has been seen for regular examinations by his pediatricians. For this reason Christopher's developmental and medical history are well documented. Christopher had bronchitis at five months of age which was successfully treated with antibiotics. P.Ex. No. 11. At eight months of age, Christopher was diagnosed as having "otitis media," or infections of the middle ear. Tr. at 100. The ear infections were treated successfully by use of antibiotics. P.Ex. No. 2 and 11.

At eleven months of age, Christopher had a recurrence of his ear infections. *Id.* Initially, Christopher was treated with antibiotics but the ear infections persisted and ultimately became chronic. *Id.* As a result, surgery for the placement of myringotomy tubes was recommended by Dr. James F. Holly, and the surgery was scheduled for February of 1988. P.Ex. No. 2. However, on February 19, 1988, Christopher was diagnosed by Dr. David Carr, Christopher's pediatrician, as having the measles. Tr. at 49. As a result, the tube placement surgery was delayed until March 10, 1988. Tr. at 9–10. The measles infection resolved with no residual complications, and the myringotomy tube placement surgery was accomplished on March 10, 1988. Tr. at 9–11; P.Ex. No. 14 at 9–13. Christopher continued to experience otitis media or ear infections following the March 10, 1988 tube placement surgery. P.Ex. No. 5 at 9.[2]

A review of the voluminous records provided in this case indicate that prior to April 5, 1988, Christopher had normal motor development and nearly normal language development. P.Ex. No. 19 at 1. He smiled at two months, rolled supine to back at four months, sat at six months, cruised at ten months, and walked at twelve months. P.Ex. No. 7 at 30; P.Ex. No. 19 at 1. At the time of the MMR vaccination, Christopher possessed a five word vocabulary consisting of "mama," dadda," "see," "hot," and "bye-bye." Tr. at 104–108, 123–125, 128–30, and 138–141. According to Christopher's mother, Lisa Reddish, and the child's grandparents, Donald and Martha Reddish, Christopher used his five word vocabulary consistently until the MMR vaccine was administered. Addi-

---

**2.** Christopher's ear infections were apparently related to enlarged adenoids. Removal of tonsils and adenoids was not recommended before the age of 18 months. Tr. at 101. A second tube placement surgery, accompanied by a tonsillectomy and removal of adenoids, was ulti-mately performed by Clifford B. Dubbin, pediatric otolaryngologist, on August 4, 1988. P.Ex. No. 5 at 6 and 15. The August 4, 1988 surgery was completely successful, and Christopher has not been troubled by ear infections since that time. Tr. at 167 and 168.

tionally, Christopher would show other responses to sound and noise, *e.g.* dance to music, watch television, point to airplanes flying overhead, point at barking dogs, and respond to his name, if called, by turning to the person calling the name. Christopher's mother testified that if she left at night, she had to back her Trans Am automobile out of the driveway before starting the engine to avoid awakening the sleeping child. Tr. at 105 and 139.

The medical records placed into evidence, and the testimony presented at the hearing in this case show that Christopher was using his five-word vocabulary and reacting to sounds both prior to and after the measles episode at age 14 months. Tr. at 105 and 140. Further, Christopher continued to speak and react to sound both prior to and after the initial surgical placement of myringotomy tubes on March 10, 1988. Tr. at 106 and 138. A sudden change in Christopher's condition was noticed by the family on the morning of April 6, 1988. Tr. at 140–141.

On April 5, 1988, at age 16 months, Christopher received an MMR vaccine from Dr. Cornelius Franz and Dr. David Carr. Tr. at 56. On the morning of April 6, 1988, less than 24-hours after receiving the MMR shot, Christopher could not be verbally awakened by his mother, Lisa Reddish. According to Lisa Reddish, she attempted to awaken Christopher by speaking to him as was her custom. Christopher did not respond and could not be awakened verbally. *Id.* In a panic, Lisa telephoned her mother, Martha Janice Reddish, who was working at the time. Martha Reddish directed Lisa to shake Christopher and by doing this, Lisa was successful in waking Christopher. Tr. at 41 and 147–152.

In the days that followed, it became readily apparent to Christopher's mother and grandparents that Christopher was not hearing sounds. Tr. at 108–112, 125–129, and 141–146. Christopher quickly lost the ability to speak. *Id.* In addition, Christopher stopped dancing to music, he would not respond to persons calling his name, and all of the indicators and responses, which in the past had demonstrated that

Christopher could hear, suddenly vanished. *Id.* There was no evidence of fever, at this time, and Christopher was in good health other than the suspected hearing loss. Tr. at 107–112.

Following the recognition of apparent hearing loss, Christopher was taken to Dr. James F. Holly for evaluation. P.Ex. No. 2 at 7–9; P.Ex. No. 4 at 4, 6. Audiologist, Marc R. Trychel, of Dr. Holly's office, evaluated Christopher's hearing through the use of Audiometry and ABR (Auditory Brainstem Response) testing. *Id.* The test results indicated that Christopher had sustained a severe sensorineural bilateral hearing loss, also referred to as nerve deafness. Tr. at 13.

Christopher's mother and grandparents sought a second opinion. Accordingly, Christopher was taken to Dr. Clifford B. Dubbin, Pediatric Otolaryngologist. Tr. at 166. Dr. Dubbin referred Christopher to Audiologist, Judith Marlowe, for further evaluations and testing. Once again, Christopher was subjected to a battery of tests consisting of audiograms, ABR testing, and hearing aid evaluations. P.Ex. No. 3 at 9, 12, 13. The test results confirmed that Christopher had sustained a severe sensorineural bilateral hearing loss. *Id.* at 8. However, because of inconsistent results of some of the tests, and because it was necessary to determine if Christopher suffered from a conductive mechanical deafness, a form of deafness that differs from nerve deafness, Christopher was referred to a pediatric neurologist by Judith A. Marlowe. *Id.* at 13.

In January of 1989, pediatric neurologist, Michael A. Pollack, performed a computerized tomography (CT) scan of Christopher's head, without and with contrast, with thin cuts through the internal auditory canals. The test results indicated no abnormalities. P.Ex. No. 10 at 7. Dr. Pollack also subjected Christopher to electroencephalogram (EEG) testing. These tests were normal as well. *Id.* at 3 and 9. In order to rule out the possibility of mechanical hearing loss, as opposed to a sensorineural hearing loss, a final Auditory Brainstem Response bone

conduction test (ABR) was arranged.[3] The test was performed by Audiologist Michelle Trychel at the Orlando Regional Medical Center on April 7, 1989. P.Ex. No. 10 at 1. No reproducible waves could be identified for either ear. The audiologist concluded that the problem was not conductive or mechanical hearing loss, but severe to profound sensorineural loss of hearing in both ears in excess of 90 decibels. *Id.* at 2.[4]

### STATEMENT OF LAW

The legislative history of the Act acknowledges the difficulties and impossibilities of successfully litigating vaccine-related injury and death cases in the traditional setting.

> [T]he opportunities for redress and restitution are limited, time-consuming, expensive and often unanswered. Currently, vaccine-injured persons can seek recovery for their damages only through the civil tort system or through a settlement arrangement with the vaccine manufacturer. Over time, neither approach has proven satisfactory. Lawsuits and settlement negotiations can take months and even years to complete. Transaction costs—including attorneys' fees and court payments—are high. And in the end no recovery may be available.

H.R.Rept. No. 908, 99th Cong., 2d Sess., pt. 1, at 6, *reprinted in* 1986 U.S.Code Cong. & Admin.News 6287, 6344, 6347.

The purpose of the Act, then, was to provide an expedited process by which to compensate those eligible vaccine-injured individuals or the estates of those who have died as a result of the vaccine admin-

istration. In that light, the Act seeks to establish a no-fault system of compensation in which the petitioner in a death or injury case does not have to demonstrate manufacturer's negligence or vaccine defectiveness. *Id.* at 6353.

The Act seeks to eliminate the difficult individual determinations of causation of injury by defining the conditions which give rise to a presumption of causation. Section 300aa–11(c)(1) essentially provides a check-list for the petitioner. If the petitioner is able to demonstrate each of the following elements by a preponderance of the evidence[5], the court may then find that the petitioner is entitled to a presumption of eligibility. § 300aa–13(a)(1)(A).

(1) The individual received a vaccine listed in the Vaccine Injury Table;

(2) The vaccine was administered in the United States or in one of its trust territories;

(3) The individual sustained or had significantly aggravated an injury set forth in the table in association with the named vaccine, or died within the time period set forth in the table; *or sustained, or had significantly aggravated, any illness disability, injury, or condition not set forth in the table but which was caused by the named vaccine;*

(4) The individual suffered residual effects from such injury for a period of greater than six months and incurred costs for more than $1,000 in unreimbursable expenses; or died as a result of the vaccine administration; and

---

**3.** The ABR test, according to the testimony, is one in which stimulus is applied directly to the mastoid bone bypassing the hammer, anvil, and stirrup, or sound conduction mechanism. If the ABR indicates deafness, then such deafness is known to originate from the nerve and not from the conductive mechanism. Tr. at 190.

**4.** The audiologist reported that hearing losses with a conductive or mechanical component would have produced identifiable wave forms during the ABR bone conduction test. Such wave forms were absent in Christopher's case. P.Ex. No. 10 at 2. Whether Christopher's type of deafness is sensorineural as opposed to conductive or mechanical is germane to this case.

**5.** The preponderance of evidence standard requires that the trier of fact "believe that the existence of a fact is more probable than its nonexistence before [the special master] may find in favor of the party who has the burden to persuade the [special master] of the fact's existence." *In re: Winship*, 397 U.S. 358, 371, 90 S.Ct. 1068, 1076, 25 L.Ed.2d 368 (1970) (Harland, J., concurring) *quoting* F. James, Civil Procedure 250–251 (1965). Mere conjecture or speculation will not establish a probability. *Snowbank Enter. v. United States*, 6 Cl.Ct. 476, 486 (1984).

(5) No award or settlement has been collected in a civil action for damages for such vaccine-related injury and death.

Thereafter, if the respondent cannot show by a preponderance of the evidence that the injury or death was due to factors unrelated to the administration of the vaccine, the petitioner is thereby entitled to compensation available under the Vaccine Act. *See* § 300aa–13(a)(1)(B). It should be noted that "unrelated" factors does not include "idiopathic, unexplained, unknown hypothetical, or undocumented factor, illness, injury or condition...." § 300aa–13(a)(2)(A).

The petition in the instant case alleges that Christopher's injury is the result of the administration of a MMR vaccination. Section 300aa–14(a)I sets forth MMR-related table injuries:

A. Anaphylaxis or anaphylactic shock;

B. Encephalopathy (or encephalitis);

C. Residual seizure disorder;

D. Any acute complication or sequela (including death) of an injury referred to above.

Deafness is an injury or condition *not* set forth in the table. Petitioner, therefore, must demonstrate that Christopher's deafness was caused by the MMR vaccination to be eligible for compensation as required by § 300aa–11(c)(1)(C)(ii)(I).

## DISCUSSION

### I.

### ENTITLEMENT

■ For the reasons set forth below, it is the court's opinion that the petitioner has demonstrated by a preponderance of the evidence facts sufficient to warrant an award of compensation under the terms of the Vaccine Act.

#### *Administered a Table Vaccine in the United States*

An affidavit of Dr. Cornelia Franz, M.D. indicates that Christopher received a MMR shot on April 5, 1988 in the United States, specifically Orlando, Orange County, Florida, thus satisfying the requirements of parts (A) and (B)(i)(I) of § 300aa–11(c)(1).[6] P.Ex. No. 7 at 3.

#### *Previous Collection of Award or Damages*

Paragraph 7 of the petition states that no award or settlement for damages for Christopher's vaccine-related injury has been previously collected. The petition contains a sworn and notarized statement of petitioner, Lisa Suzanne Reddish, that statements contained therein are true and correct, satisfying the requirement of § 300aa–11(c)(1)(E). *See also* fn. 6, *supra.*

#### *Suffered Residual Effects*

Petitioner testified at the hearing in this case that she has spent in excess of $3,000 for medical care and treatment for Christopher's hearing loss. Tr. at 143–144. In fact, $1,500 in expenses were incurred for purchase of hearing aids alone. Tr. at 144, 146. These expenditures satisfy the requirements of § 300aa–11(c)(1)(D)(i).

#### *Suffered an Injury Caused by the Vaccine*

The issue of whether Christopher suffered a sensorineural hearing loss as a result of the MMR vaccine is disputed by respondent. Based on the Medical Review completed by respondent's expert on March 28, 1989, respondent contends that Christopher sustained a conductive or mechanical hearing loss as the result of chronic ear infections. P.Ex. No. 19 at 3. Respondent's position is summarized in the following paragraph taken from the Medical Review:

The history of chronic otitis media is significant. There is no question that chronic infection can result in a severe mixed[7] hearing loss with resulting lan-

---

**6.** Moreover, respondent in its Medical Review has conceded that parts (A), (B)(i)(I) and (E) of § 300aa–11(c)(1) have been satisfied. P.Ex. No. 19.

**7.** Dr. Dubbin, one of petitioner's experts, explains that a "mixed hearing loss" means documented neurosensory *and* conductive hearing loss. Dr. Dubbin does not dispute the fact that Christopher suffered from *some* conductive

guage delays. This is supported by the child's language delay dating from probably less than 12 months with the onset of his otologic difficulties dating from 8 months of life. In addition, however, based upon the notes from his audiologist (12/88) the question of secondary central deafness or verbal auditory agnosia was being raised indirectly. That is, the child's hearing loss was not felt to be sufficient to explain his language delay, and therefore she sent the child to a neurologist for another opinion. There is overwhelming evidence that the child's hearing loss predated the administration of the vaccine and that it resulted from the chronic purulent otitis media which first presented at 8 months of age.

*Id.*

The court finds that petitioner has demonstrated by a preponderance of the evidence that Christopher suffered an adverse reaction to the MMR vaccine that caused profound sensorineural hearing loss in both ears. This opinion rests on the process of reasoning by which Doctors Holly and Dubbin supported their opinion and the fact that the evidence presented by petitioner's medical experts is entitled to considerable weight.

*Expert Testimony of Dr. James F. Holly.* Dr. Holly, physician and surgeon, received his medical degree from the University of Miami and was licensed in the State of Florida in 1959. For the past 22 years, Dr. Holly has been board certified in the field of otolaryngology (ear, nose, and throat). Dr. Holly is currently on the staff of Humana Lucerne Hospital and Orlando Regional Medical Center. Tr. at 9. Dr. Holly testified that based on his review of the records, the results of tests, and his own examination, care and treatment, it is his opinion that Christopher suffered a bi-

lateral severe sensorineural hearing loss as a result of the MMR shot administered on April 5, 1988.

Dr. Holly first saw Christopher on February 9, 1988 for the purpose of treating a middle ear infection (otitis media). Dr. Holly described the problem: "[T]he area ... between the eardrum and the inner ear, is called middle ear. In that cavity, which is normally air filled, fluid of various types and various causes will collect. When this happens, it's termed otitis media." Tr. at 17. Dr. Holly explained that otitis media is thought to be due to eustachian tube obstruction. The generally accepted causes of such obstruction, according to Dr. Holly, are anatomy, colds, respiratory allergies, and enlarged adenoids. Tr. at 18. Christopher's initial treatment with antibiotics was not successful. On March 10, 1988, myringotomy tube placement surgery was performed on both ears to provide drainage. Tr. at 10. This procedure, formerly called "lancing the ear, is quite common and is successful in approximately 80% of the cases, according to Dr. Holly." Tr. at 27.

Dr. Holly stated that otitis media can cause some hearing loss, but not to the degree suffered by Christopher. Tr. at 18, 20–23. Dr. Holly explained that there are two kinds of hearing loss. "Mechanical" or "conductive" hearing loss is one type. Otitis media can cause severe mechanical or conductive hearing loss, "but not sensorineural hearing loss to this degree."[8] Tr. at 15. When Dr. Holly was questioned about respondent's Medical Review and the opinion of Dr. McCormick, respondent's expert, Dr. Holly made the following statement: "[H]er opinion was that [Christopher] had enough middle ear infection to cause this degree of deafness. That's not so. There's no way that a middle ear infection can cause this much deafness." Tr. at 14–15.

hearing loss during the time that Christopher had fluid behind the eardrums [otitis media]. Dr. Dubbin does not believe the otitis media caused the type of hearing loss from which Christopher presently suffers. Tr. at 196–197.

**8.** The worst hearing loss that can result from a mechanical or conductive problem, according to

Dr. Holly, would be about 30 decibels unless radical mastoidectomy surgery were required. In that case hearing loss of approximately 65 decibels might occur. Tr. at 20. Decibels are roughly equivalent to a percentage. Therefore, a 65 decibel hearing loss would translate roughly to a 65% hearing loss. Tr. at 20.

Dr. Holly explained that the second kind of deafness is "sensorineural," otherwise known as nerve deafness, in which the hearing nerve is not working. The causes of nerve deafness, according to Dr. Holly's testimony, are aging, brain tumors, injuries, toxins, and, in addition, the so-called febrile illnesses of childhood, measles and mumps. Tr. at 21. Dr. Holly testified that although Christopher had a case of measles during this time, he did not find evidence of hearing loss following the resolution of the disease.[9] Tr. at 22. It was Dr. Holly's opinion that [Christopher] had an "irrelevant middle ear infection, and he got an MMR shot and lost his hearing." Tr. at 28.

*Expert Testimony of Dr. Clifford Benjamin Dubbin.* Dr. Dubbin, physician and surgeon, is a graduate of the University of Florida College of Medicine and was licensed in the State of Florida in 1979. Dr. Dubbin is a board certified otolaryngologist, a Fellow of the American Academy of Otolaryngology and Head and Neck Surgeons, and a member of the American Academy of Otolaryngology—Allergy. He is currently chief of the division of otolaryngology at AMI Medical Center, Orlando, and is on the staff and board of directors of Sand Lake Hospital, part of Orlando Regional Medical Center, on the staff of Humana Hospital Lucerne, and courtesy staff at Florida and West Orange Hospitals.

Dr. Dubbin testified that in his opinion the MMR shot administered on April 5, 1988 caused a reaction in Christopher's body which damaged his inner ears irreversibly and permanently. Tr. at 175. Dr. Dubbin reached this conclusion following a review of Christopher's medical records, including the Medical Review prepared by respondent's medical expert, and following his own examination and investigation. Tr. at 174–174. The type of hearing loss, according to Dr. Dubbin's testimony, is sensorineural—nerve deafness. Tr. at 175.

Dr. Dubbin stated that he first began treating Christopher on June 20, 1988. Tr. at 166. According to Dr. Dubbin, Christopher had been referred to him for a second opinion as to the extent and cause of Christopher's hearing loss. *Id.* An examination was performed and a medical history taken. Based upon the examination and history, Dr. Dubbin confirmed Dr. Holly's diagnosis that Christopher had sustained a severe bilateral sensorineural hearing loss. Tr. at 167.

From the medical history, Dr. Dubbin was aware that Christopher had an episode of measles in February of 1988 which resolved without complication prior to the March 10, 1988 surgery for tube placement performed by Dr. Holly. Tr. at 169–170. In addition, Dr. Dubbin was aware that Christopher suffered from chronic otitis media, had received the MMR vaccination, and suffered a reported hearing loss on April 6, 1988. Tr. 166–170.

To confirm his opinion that Christopher's hearing loss was attributable to the MMR shot, Dr. Dubbin presented Christopher's case history to the professors of otolaryngology at the University of Florida School of Medicine, in Gainesville, Florida. Tr. at 170. Dr. Dubbin conferred with Dr. George Singleton and Gerald Merwin, both of whom, according to Dr. Dubbin, are leaders in the area of ear research. *Id.* Dr. Singleton pioneered middle ear and inner ear surgery in the United States. Tr. at 181. Dr. Dubbin's diagnosis was confirmed. The three doctors agreed, according to Dr. Dubbin's testimony, that an adverse reaction to the MMR vaccine caused damage to Christopher's inner ear called the organ of corti. Tr. at 171.

At the hearing, Dr. Dubbin was asked to respond to the HHS Medical Review and the opinion of Dr. McCormick that chronic otitis media caused Christopher's hearing loss. Dr. Dubbin disagreed with Dr. McCormick's diagnosis. Tr. at 175, 194–197. Dr. Dubbin stated: "[The] weight placed [by Dr. McCormick] on the number of frequencies of his ear infections ... in

9. In the HHS Medical Review, respondent's expert conceded that the measles infection suffered by the child during the month of February, 1988 resolved itself with no apparent central nervous system involvement or sequelae. Respondent, therefore, did not consider measles to have caused Christopher's injury. P.Ex. No. 19 at 2.

my opinion, is not at all within the realm of the accepted otolaryngology specialty.... I feel that her opinion is based more on what a non-trained ear specialist would think ... [W]hen you try to wake your child up in the morning and they don't respond, that's something that doesn't happen overnight unless there's a catastrophic episode ..." Tr. at 195–196. According to Dr. Dubbin, theoretically, a middle ear infection may spread into the inner ear, but the chance of an ear infection striking both ears at the same time, causing an equal amount of damage in both ears, is "untenable." Tr. 175–176. Further, "... it's very rare to see an ear infection that does not have a meningitis involved, actually cause a sensorineural hearing loss." Tr. at 176. Dr. Dubbin stated that for a routine middle ear infection to permanently damage the inner ear on just one side is extraordinarily rare. Tr. at 177. Christopher had no signs or symptoms of meningitis, and his hearing loss occurred symmetrically in *both* ears. *Id.* According to Dr. Dubbin, "[f]or us to postulate that repeated ear infections caused an equal and symmetric hearing loss in either ear is too astronomical to believe." *Id.* Dr. Dubbin also testified that for Dr. McCormick's hypothesis to be correct, a mechanical or conductive hearing loss would have been present. Tr. at 178. In Christopher's case, the ABR bone conduction test ordered by Dr. Pollack and performed by Audiologist Michelle Trychel shows not mechanical or conductive hearing loss, but nerve deafness, Tr. at 178–179, as did all other tests performed on Christopher by other doctors. Tr. 189–190.

On examination by the Court, Dr. Dubbin testified that the episode of measles which Christopher experienced in February of 1988 did not cause the sensorineural hearing loss. Tr. 186–188. Meningitis, as well as possible birth defects, were also ruled out by Dr. Dubbin as potential causes of Christopher's hearing loss. Tr. 192–193. Finally, Dr. Dubbin testified that the chronic otitis media, or ear infections alone, would not have caused the type or extent of hearing loss present in Christopher. Tr. 194–197.

Dr. Dubbin was asked by the court to explain the worst possible hearing loss scenario which can be caused by a conductive or mechanical failure in the middle ear. Tr. 198. Dr. Dubbin responded that the worst case scenario would be a 60 decibel hearing loss from a conductive mechanism.[10] *Id.* Dr. Dubbin agreed that the degree of hearing loss sustained by Christopher is greater than 60 decibels. Tr. at 198. Dr. Dubbin emphasized that in his opinion, the MMR shot[11] had, indeed, caused the hearing loss. Tr. at 182.

## II.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Based on the evidence presented in this case, the court finds that Christopher Eugene Reddish sustained, or had significantly aggravated, a bilateral sensorineural hearing loss which was caused by a MMR vaccination administered on April 5, 1988 in

---

**10.** When asked the same question, Dr. Holly postulated a 65 decibel hearing loss. *See* footnote, p. 372 *supra.*

**11.** Dr. Dubbin testified that it was his medical opinion that the mumps component was more likely to be the specific cause of Christopher's adverse reaction: "Mumps are known to attack the inner ear as well as the testicles directly ... For someone to have mumps to end up with a hearing loss is not uncommon ..." Tr. at 184, 186.

The United States Department of Health and Human Services Morbidity and Mortality Weekly Report (MMWR) Volume 31, No. 46, November 16, 1982, on pages 617–625, contains the following statements concerning the MMR vaccine: "Very rarely, manifestations of CNS [cen-

tral nervous system] involvement, such as febrile seizures, unilateral *nerve deafness,* and encephalitis within 30 days of mumps vaccination, are reported." P.Ex. No. 20 at 2. (Emphasis supplied).

The following warning concerning MMR is contained on a Florida County Health Department form, "HRS Form 1098, Mar 88 [sic]": "Important Information about Measles, Mumps, and Rubella [MMR] Vaccines ... Although experts are not sure, it seems that very rarely children who get these vaccines may have a more serious reaction such as inflammation of the brain (encephalitis), convulsions with fever, or *nerve deafness."* *Id.* at 5. (Emphasis supplied).

Orlando, Florida, United States of America. The court finds further that, although bilateral sensorineural hearing loss is not an injury, illness, disability or condition set forth in the vaccine injury table, Christopher Eugene Reddish sustained such injury as a result of the MMR vaccine, a vaccine listed in the vaccine injury table, and is entitled to compensation pursuant to § 300aa–11(c)(1)(C)(ii)(I).

The court finds also that petitioner has demonstrated by a preponderance of the evidence, the matters required by § 300aa–11(c)(1) of 42 U.S.C., see p. 371 supra, and that there is not a preponderance of the evidence that the severe bilateral sensorineural hearing loss described in the petition is due to factors unrelated to the administration of the MMR vaccine described in the petition. The court makes such findings based on the claims of petitioner, which are substantiated by medical records and by medical opinion as described herein.

The court finds that Christopher Eugene Reddish is entitled to compensation pursuant to § 300aa–13 as described below.

## III.

### DAMAGES

*Statutory Provisions.* Compensation awarded under the Vaccine Act for a vaccine-related injury includes actual unreimbursable expenses incurred from the date of judgment for medical or other remedial care, diagnosis, rehabilitation, evaluation, special education, vocational training and placement, counseling, special equipment, and other expenses determined to be reasonably necessary. *See* § 300aa–15(a)(1)(A). In addition, the petitioner is entitled to an award for pain and suffering, loss of earnings, reasonable attorneys' fees, and other costs incurred in pursuing its claim. *See* § 300aa–15(a)(3), (4); § 300aa–15(e). Because this is a retrospective case, however, any compensation

for loss of earnings, pain and suffering, attorneys' fees and other costs is limited to $30,000. *See* § 300aa–15(b). Section 300aa–15(f)(4) requires that a compensation award shall be determined on the basis of the net present value of the elements.

*Compensation Request.* In support of petitioner's request for compensation, petitioner has filed a report prepared by Paul M. Deutsch, Ph.D, vocational rehabilitation specialist and certified rehabilitation counselor. The report includes a Life Care Plan, a Vocational Worksheet, and an Overview of Problems for the Deaf Individual. P.Ex. No. 13. In preparation of the Life Care Plan, Dr. Deutsch reviewed the records of Christopher's treating physicians, including an affidavit and projected services plan submitted by Judith A. Marlowe, Ph.D., a licensed and certified audiologist. P.Ex. No. 3 at 1, 2, 7, and 10. The Life Care Plan submitted by Dr. Deutsch lists 25 categories of equipment and services needed for treatment and rehabilitation. In all but a few categories, Dr. Deutsch has given the court an estimated low and an estimated cost high range. Dr. Deutsch has also provided a projection as to loss of future earnings.

In addition to Dr. Deutsch's report, petitioner has submitted a report of F.W. Raffa, Ph.D, consulting economist. P.Ex. No. 12. Dr. Raffa assessed the net present value of the lifetime cost of the Life Care Plan developed by Dr. Deutsch.[12] To calculate the future value or future cost of goods and services, Dr. Raffa applied an inflation or growth rate projection from the appropriate component of the U.S. Department of Labor's Consumer Price Index. The resultant future cost projections were then reduced to present value by using an interest or discount rate of 7.0%. P.Ex. No. 12 at 1. Dr. Raffa subjected Christopher's lifetime earning capacity to the same analysis. Dr. Raffa's analysis of life care needs can be summarized as follows:

---

**12.** The base figure used by Dr. Raffa to calculate the present value of each item is the lower of the cost estimates projected by Dr. Deutsch.

| Category | Future Value | Present Value |
|---|---|---|
| Cost of Evaluation/ Speech Therapy | $ 263,716 | $ 16,234 |
| Cost of Therapeutic Modalities | 226,980 | 123,982 |
| Cost of Home Furnishings & Accessories | 144,614 | 4,379 |
| Cost of Aids for Independent Function | 1,505,994 | 72,966 |
| Cost of Home/Facility Care & Interpreter Services | 3,022,795 | 125,068 |
| Cost of Medical Care | 65,136 | 2,888 |
| TOTAL | $5,229,235 | $345,517 |

P.Ex. No. 23 at 2.

Petitioner's request for compensation is based on Dr. Raffa's projections. While the figures presented by Dr. Deutsch and Dr. Raffa are not in controversy, the court has subjected the assumptions to independent analysis. With one exception, noted below, the court finds the services and the projected costs to be reasonable. A description of such services, and the court's recommended awards follow:

*Future Medical and Rehabilitation Expenses* [13]

*Evaluations and Speech Therapy, $16,234.* Christopher Reddish will require speech therapy once a year until he reaches the age of majority. Audiological evaluations will be required 6–8 times in the first year, 3–4 times in the second year, 2 times each year until the age of 18, and once each year for the remainder of his life. Christopher will also require a developmental psychologists's assistance six times before he reaches the age of 18, and vocational rehabilitation evaluation at ages 16 and 18.

*Therapeutic Modalities, $123,982.* Christopher will require auditory training once a week between the ages of 2 and 6, speech and language training 4 times a week in the first year, then 2 times a week until he reaches the age of 18. Petitioner also requests parental education and training (which includes instruction in signing), family counseling, and career guidance and counseling. Career guidance and counseling would be offered when Christopher is age 18 and includes: career exploration; career decision making; matching of interests, job satisfiers, job motivation, and abilities to available alternatives; job seeking skills training; selective placement assistance; and work adjustment counseling.

*Home Furnishings and Accessories, $4,379.* Petitioner requests funds for the following items and periodic replacements based on useful-life estimates: a smoke detector and sound activated alarm system for hearing impaired, a doorbell/telephone signal system, and an intermatic timer alarm clock.

*Aids for Independent Function, $72,966.* It is projected that Christopher will require a telecommunication device (TDD), a portable TDD porta view, a telecaption device, an estimated amount for maintaining this equipment, and replacements every 5–7 years. Christopher will also require post-auricular hearing aids, back-up hearing aids, ear molds, maintenance, and replacements for the rest of his life. These home accessories and other aids will assist Christopher to become independent, enhance his communicative abilities, and provide a modicum of safety.

*Home Facility Care/Interpreter Services, $62,534.* Dr. Deutsch projects that interpreter services will be necessary if Christopher is unable to develop speech, language, and hearing, and uses a signing program for communication. Between the ages of 3 and 18, an interpreter would be

13. Stated in present value.

required on an average of 1 to 2 hours each week. After the age of 19, it is alleged, Christopher would require an interpreter 3 to 5 hours per week for the remainder of his life. Petitioner requests an amount of $125,068 for these services.

This assistance, however, is premised upon speculation. If the petitioner is able to develop speech, language, and hearing skills, these services will not be required. The court hesitates when compensation prayed for is based on the occurrence or non-occurrence of an event in the future. In this instance, however, the court is persuaded that a pre-lingually deaf individual is likely to require such services on a limited basis, at least. In view of Christopher's age at onset of his hearing loss, the chances of developing understandable speech may be lessened considerably. Christopher would need an interpreter when making major purchases—e.g. a home or automobile—when opening a bank account, visiting a doctor, applying for a mortgage loan, arranging for utility hook up—matters that hearing persons take for granted. The court recognizes also, however, that the requested funds reflect conservatively the market value of such services that are often provided by a parent, friend, or companion. For this reason, the court recommends that an award for these services be included, but for a reduced number of hours per week.[14]

*Medical Care, $2,888.* Finally, petitioner seeks compensation for projected costs for ear, nose, and throat (ENT) evaluations. Routine assessments, it is claimed, should be conducted twice a year until the age of 18, thereafter, every second year.

*Diagnostic Testing/Educational Assessment.* Dr. Deutsch's report includes a category for special education, P.Ex. No. 13 at 14, but petitioner has not submitted any figures. Special education is provided under many state education programs. Without additional information, therefore, the court does not recommend compensation to cover such services beyond what has been included under other categories outlined above.

Information is not available regarding petitioner's prospective entitlement, if any, to the Social Security disability benefits, supplemental security income, medicare, or medicaid programs. These are all programs administered by respondent and information necessary to determine petitioner's eligibility is solely within respondent's control and expertise. Respondent has not responded with a request for such information. No reduction of petitioner's award by the projected amount of those benefits, therefore, is possible.

### Loss of Earnings and Pain and Suffering

The Vaccine Act permits an award for loss of earnings and for pain and suffering and emotional distress. Dr. Deutsch's report includes persuasive evidence that, for a variety of reasons, the hearing impaired can anticipate reduced lifetime earnings. P.Ex. No. 13 at 6–7.[15] In addition, Dr. Deutsch explains, the quality of life for pre-lingually deaf persons is profoundly al-

---

**14.** Dr. Raffa states that, as of December, 1989, Christopher would have a remaining life expectancy of approximately 70 years (per 1985 U.S. Life Tables). P.Ex. No. 12 at 1.

Using petitioner's figures, the court estimates that Christopher will need a minimum of 780 hours for interpreter services through age 18, and 8,580 hours for the remaining years of his life expectancy. P.Ex. No. 13 at 18. Based on an average of $17 per hour, and applying a 5.62% growth rate, the projected future value of interpreter services would be $3.03 million, or $125,068 in present value. *Id.*; P.Ex. No. 12 at 5. In attempting to assess reasonable compensation for this element of petitioner's claim, the court anticipates that Christopher can expect voluntary services from relatives or friends for

as many as half of such hours. It is the opinion of the court that $62,534 represents a reasonable award for interpreter services.

**15.** On the basis of the vocational assessment performed by Dr. Deutsch, Dr. Raffa projects that, if Christopher enters the work force upon high school graduation, he can expect a base annual earning capacity of $11,544. Without hearing impairment, Christopher could anticipate an earning capacity of $15,983. Projected over a remaining work-life expectancy of 47.49 years, applying an earnings growth rate of 5.47%, Dr. Raffa estimates the future value of loss of earning capacity to be $2.1 million. P.Ex. No. 12 at 1–2.

tered in virtually every aspect.[16] *Id.* at 8–9.

In retroactive cases, however, the court is limited in the amount that can be awarded for loss of income, pain and suffering, attorneys' fees, and costs. § 300aa–15(b). In the present case, reasonable attorneys' fees and costs, alone, will approach the $30,000 cap mandated by the statute. Awards for loss of future wages and for pain and suffering, although merited, should not be permitted to reduce attorneys' fees to an unreasonable amount. On the contrary, it is in the public's interest to encourage attorneys to accept vaccine-injury cases by assuring a reasonable fee. For this reason, the court recommends that an award of $1,184.30 be made for loss of future wages, and an award of $1,184.30 be made for pain, suffering, and emotional distress.

## IV.

### ATTORNEYS' FEES AND COSTS

■ *Calculation of Reasonable Fees.* This court has determined that the appropriate method for computation of attorneys' fees awarded under the Act is to be based upon the "lodestar" model approach. *See Gregson v. Secretary of the Dept. of Health and Human Services,* No. 88–1V, Slip Op. at 6–9 (Cl.Ct., April 24, 1989). The lodestar is the product of the reasonable hours expended times a reasonable hourly rate. The resulting figure is an objective estimate, presumed to be a reasonable fee to which the petitioning attorney is entitled. *Hensley v. Eckerhart,* 461 U.S. 424 at 434, 103 S.Ct. 1933 at 1939–40, 76 L.Ed.2d 40 (1983). The lodestar figure is subject to adjustment by a number of factors. *See Johnson v. Georgia Highway Express,* 488 F.2d 714 (5th Cir.1974). Those factors include, but are not limited to, the time and labor required, the novelty and difficulty of the questions, the skill requisite to perform the legal service properly, and other factors. The fee applicant carries the burden of proof, and contemporaneous time records are required. The reasonable hourly rate is "the prevailing market rate in the relevant community" for similar services by lawyers of comparable skill, experience, and reputation. *Blum v. Stenson,* 465 U.S. 886, 895, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984).

Petitioner has submitted its request for attorney's fees and costs in the form of an affidavit from petitioner's counsel, supporting affidavits from other attorneys in Orlando, Florida relative to the reasonableness of the fee request, and a computerized printout of contemporaneous time records. Most of the legal services provided on behalf of petitioner in this case, were performed by Berry James Walker, Jr., Esquire, an associate in the firm of Broad and Cassel of Maitland, Florida. Mr. Walker has documented a total of 125.6 hours. Petitioner's affidavit requests $110 per hour for services expended by Mr. Walker. A careful analysis of the computerized printout, however, indicates that up to and including February 17, 1989, Mr. Walker's services were billed at $95 per hour. Mr. Walker's rates were not increased to $110 per hour until after February 17, 1989. The court has adjusted petitioner's claim for fees to reflect this change in rates.

Mr. Walker was assisted by Robert D. Gatton, Esquire, a partner in the firm of Broad and Cassel, two associates, two para-

---

**16.** The Deutsch report states as follows:

There is little question that we are dealing with a child who has a severe sensorineural hearing loss, pre-lingually, resulting in limitations in independent living skills, activities of daily living, vocational development and educational development. The Life Care Plan outlines recommendations to help reduce the severe psychological consequences ... Studies show that about nine (9) out of ten (10) prevocationally deaf persons marry other deaf persons, however, pre-lingually deaf people remain single at a rate higher than for the general population ... A pre-lingually deaf parent is ... at a disadvantage in communicating thoughts, advice, and feelings to his children ... [This] will present a lack of empathy between the parent and the children and flaw their relationship ... Research indicates that early deafened individuals have a poor self-image, reflective of how others regard the individual, [and] deaf people represent potentially strong candidates for psychological or psychiatric services.... P.Ex. No. 13 at 4, 8–9.

legals, and one non-professional. The following hours are claimed:

| | | | |
|---|---|---|---|
| RDG, Partner | 14.0 hours @ | $150 | per hour |
| MSS, Associate | 8.9 hours @ | 110 | per hour |
| DRL, Associate | 2.5 hours @ | 110 | per hour |
| DKD, Paralegal | 18.3 hours @ | 65 | per hour |
| SJB, Paralegal | 1.0 hours @ | 65 | per hour |
| JMD, Unspecified | .4 hours @ | 65 | per hour |

A review of the computerized time records verify these figures, with one additional exception. Services performed by the associate "MSS" should have been billed at a rate of $100, not $110 per hour for the first 7.0 hours. The rate for MSS increased to $110 after February, 1989 and should be applied only for the remaining 1.9 hours performed after that date. The court has adjusted its recommendation accordingly.

In addition, petitioner has submitted a description of costs, including expert witness fees, travel, filing fees, doctor's consultation fees, photocopying, and other expenses, totaling $11,531.60. This figure is somewhat high. The largest item of expense, by far, however, is for consultations and expert witness fees. A number of expert witnesses from several fields were required to verify petitioner's claim, and the court is of the opinion that such expenses should be allowed in this case. Petitioner has been able to document only $10,333.90 of this amount, however. The court, therefore, recommends $10,333.90 as an appropriate amount to be awarded for costs.

The court is persuaded that petitioner's requests are reasonable as adjusted herein and recommends an award of $27,631 for attorneys' fees and costs.

## CONCLUSION

This case appears to be appropriate for an award under the National Vaccine Injury Compensation Program, and the amount of $312,983.00 appears to be an appropriate figure for that award. It is hereby recommended that the court enter a judgment in favor of petitioner in that amount.