**Melissa HINES, on behalf of her minor daughter, Amber SEVIER, Petitioner,**

v.

**SECRETARY OF the DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent.**

No. 89–90V.

United States Claims Court.

Oct. 15, 1990.

Berry J. Walker, Jr., Maitland, Fla., for petitioner. M. Susan Sacco, Miami, Fla., of counsel.

David L. Terzian, with whom were Asst. Atty. Gen. Stuart M. Gerson, Director Helene M. Goldberg, Deputy Director John Lodge Euler and Asst. Director Charles R. Gross, Washington, D.C., for respondent.

## OPINION

LYDON, Senior Judge:

This case comes before the court on petitioner Melissa Hines' motion for review of the decision of a Special Master dismissing her petition seeking compensation for injuries suffered by her minor daughter, Amber Sevier, allegedly caused by a measles-mumps-rubella (MMR) vaccine. The petitioner filed her petition for compensation on August 28, 1989, as provided by the National Vaccine Injury Compensation Program, 42 U.S.C. §§ 300aa–10 *et seq.* (Supp. V 1987), *as amended,* 42 U.S.C.A. §§ 300aa–10 *et seq.* (West Supp.1990).[1] For the following reasons, the court sustains the decision of the Special Master dismissing the petition.

## FACTS

Amber Sevier was born to petitioner Melissa Hines on October 5, 1987. The delivery and birth were apparently uncomplicated, and Amber's APGAR scores were 8 and 9 out of a possible perfect score of 10.[2] Amber received her first DPT (diphtheria-polio-tetanus) and OPV (polio) vaccinations on March 3, 1988, at approximately five months of age, and her second set of these vaccinations on May 12, 1988, with no apparent adverse side effects. Amber's medical records show that she was diagnosed with middle ear infections in both ears (bilateral otitis media) on August 15, 1988, November 1, 1988 and November 11, 1988. Amoxicillin was prescribed on all three occasions.

On January 26, 1989, at the age of fifteen months, Amber received her third DPT shot and her first MMR vaccination. Prior to that date, Amber showed no sign of a hearing or speech problem. She responded to the sounds of music, sirens, cars and human voices, and she could speak six words. On February 1, 1989, six days after her MMR shot, Amber developed a fever of 104.4 degrees, which prompted her mother to take Amber to the emergency room of a local hospital. The emergency room records show that Amber had been ill for the past two days with a cough and nasal congestion, that she had had loose stools the previous day, and that on the day of her visit to the emergency room, Amber had vomited twice and had been pulling at her ears all day. Amber showed signs of bilateral otitis media and respiratory problems, and she was diagnosed with pneumonia. Amoxicillin was prescribed. Although not reflected in the hospital records, Amber's mother Melissa Hines testified that Amber also had a severe diaper rash on February 1, the day of her hospital visit, and that her blisters had begun to bleed before she was taken to the hospital. Melissa testified that the doctor at the hospital told her to apply ointment to the rash, and to change Amber's diaper more frequently.

The next day, February 2, 1989, Melissa took Amber to a pediatric clinic, where Amber was diagnosed with bilateral otitis media and possible bilateral pneumonia. Augmentin was prescribed. On a follow-up visit on February 6, 1989, Amber's ear infections and pneumonia were found to have improved, and by her next follow-up visit on February 16, 1989, Amber's infections had cleared up.

---

1. The Vaccine Injury Compensation Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986 (Vaccine Act), 42 U.S.C. §§ 300aa–1 *et seq.,* (Supp. V 1987), *as amended* by several public laws codified at 42 U.S.C.A. §§ 300aa–1 *et seq.* (West Supp.1990).

2. The term "APGAR" stands for *a*ppearance, *p*ulse, *g*rimace, *a*ctivity and *r*espiration.

During that time period or shortly thereafter, Melissa and Amber's grandmother noticed that Amber was not responding to their verbal remarks and was seemingly ignoring them. In addition, Amber appeared to have lost her equilibrium and her ability to speak. Melissa became very concerned when she dropped some pots and pans on the floor near Amber and Amber did not respond. Melissa then beat some pans with a spoon near Amber's head, and Amber did not respond until she saw what her mother was doing. Melissa took Amber to the pediatric clinic on March 27, 1989 to have her hearing checked. Amber was diagnosed as having a moderate to severe bilateral sensorineural hearing loss. Since the initial evaluation, subsequent hearing tests indicate Amber's hearing loss has fluctuated and progressed to a profound loss in her right ear and has remained relatively stable as a moderate to severe loss in her left ear.[3] Consequently, Amber now wears a hearing aid in her left ear, as the hearing loss in her right ear is virtually 100%. She has not learned any new words and she communicates primarily through sign language.

Petitioner presented her evidence before the Special Master in a hearing held on April 25, 1990 in Orlando, Florida. Respondent did not appear or participate in the hearing. The only evidence respondent submitted to the Special Master was a medical review signed by three doctors employed by the Department of Health and Human Services, and filed with the court on March 30, 1990. Respondent's medical review recommends denial of compensation based upon the lack of evidence in the medical records to show that Amber's hearing loss resulted from the MMR shot.

The Special Master issued a decision on June 22, 1990, in which he found that petitioner was not entitled to compensation for Amber's hearing loss under the Vaccine Injury Compensation Program because there is not a preponderance of evidence showing the specific cause of Amber's hearing loss. Petitioner thereafter filed a

Motion for Review of the Special Master's decision on July 20, 1990. Respondent timely filed a response to petitioner's motion for review on August 20, 1990. Oral argument was heard on October 10, 1990.

## DISCUSSION

I. Scope of Review

In 1989, amendments were made to certain provisions of the Vaccine Act and to the Rules of the United States Claims Court (RUSCC) (Vaccine Rules—Appendix J) which provided new guidelines for the Claims Court when a party seeks review of a Special Master's decision. Section 300aa–12 of the Vaccine Act, as amended, now states in pertinent part:

(e) **Action by the United States Claims Court**

. . . .

(2) Upon the filing of a motion [for review of the special master's decision] with respect to a petition, the United States Claims Court shall have jurisdiction to undertake a review of the record of the proceedings and may thereafter—

(a) uphold the findings of fact and conclusions of law of the special master and sustain the special master's decision;

(b) set aside any findings of fact or conclusions of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and issue its own findings of fact and conclusions of law, or

(c) remand the petition to the special master for further action in accordance with the court's direction.

In conjunction with section 300aa–12(e), Rule 5 of the Vaccine Rules (RUSCC—Appendix J), which governs the court's review of a Special Master's decision, mirrors in pertinent part the statutory provisions set out above.

---

**3.** In her motion for review, petitioner disputes the Special Master's finding that Amber's hearing loss deteriorated between her initial and subsequent hearing tests. This dispute is discussed *infra*, as petitioner's twelfth assignment of error.

In reviewing the Special Master's decision, the court is also governed where appropriate, by its basic rules, *i.e.*, RUSCC. RUSCC 61 provides in pertinent part: "The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties." The Federal Circuit and one of its predecessor courts, the Court of Claims, have noted that an error is harmless if the outcome of the decision would not have changed had there been no error. *See Smithkline Diagnostics, Inc. v. Helena Laboratories Corp.*, 859 F.2d 878, 892 (Fed.Cir.1988); *Sanders v. United States*, 219 Ct.Cl. 285, 298, 310, 594 F.2d 804, 811, 818 (1979).

The Vaccine Act and the rules promulgated thereunder give the court authority to set aside any of the Special Master's findings of fact or conclusions of law that the court finds to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Because the amendments to the Vaccine Act and the Vaccine Rules have been in effect only since January 1990, the court is in the formative stages of evaluating these standards of review in vaccine cases. To determine the meaning and the correct application of these standards of review, the court turns to relevant case law applying similar standards of review in other contexts.

In the context of reviewing a federal agency's decision under the arbitrary and capricious standard of review in the Administrative Procedure Act, 5 U.S.C. § 706, the Supreme Court explained that:

> under the "arbitrary and capricious" standard, the scope of review is a narrow one whereby a reviewing court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.... Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 [91 S.Ct. 814, 824, 28 L.Ed.2d 136] (1971). The agency must articulate a "rational connection between the facts found and the choice made." *Burlington Truck Lines v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962).

*Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281, 285, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974). *See also Hyundai Elecs. Indus. Co. v. United States Int'l Trade Comm'n*, 899 F.2d 1204, 1209 (Fed.Cir.1990) (touchstone of arbitrary, capricious, abuse of discretion standard of review is rationality, *i.e.*, consideration of relevant factors and absence of clear error of judgment) (citing *Citizens to Preserve Overton Park, supra*).

The "abuse of discretion" standard was defined by the Federal Circuit in the context of reviewing a district court's decision regarding a discovery matter. In *Heat & Control, Inc. v. Hester Industries, Inc.*, 785 F.2d 1017, 1022 (Fed.Cir.1986), the Federal Circuit explained:

> An abuse of discretion occurs when (1) the court's decision is "clearly unreasonable, arbitrary or fanciful" ...; (2) the decision is based on an erroneous conclusion of law ...; (3) the court's findings are clearly erroneous ...; or (4) the record contains no evidence on which the district court rationally could have based its decision.... However, the phrase [abuse of discretion] means ... that the court has a range of choice, and that its decision will not be disturbed as long as it stays within that range and is not influenced by any mistake of law.... Such abuses [of discretion] must be unusual and exceptional; we will not substitute our judgment for that of the trial judge.

*Heat & Control, supra,* 785 F.2d at 1022. These cases indicate that a rational connection between the facts found and the decision made is a common factor that must underscore any "arbitrary and capricious" determination as well as any "abuse of discretion" determination by a reviewing court.

As suggested by case law, as well as the provisions of the Vaccine Act and the Vac-

cine Rules, the standards of review applicable to this case must be applied to both the factual findings and the legal conclusion of the Special Master. First, the court will review the Special Master's factual findings to which petitioner objects to determine whether such findings are arbitrary, capricious, or an abuse of discretion. Next, the court will review the Special Master's sole legal conclusion to determine whether it is "in accordance with law."

The Special Master set forth the following findings of fact in his decision:

1. Prior to January 26, 1989, Amber Sevier had no apparent hearing problems.

2. On January 26, 1989, the MMR vaccine was administered to Amber Sevier in Orlando, Florida.

3. On or about January 30, 1989, Amber came down with an infection, the symptoms of which were fever, cough, yellow nasal congestion, loose stools, and vomiting.

4. On February 1, 1989, Amber's illness was diagnosed as reactive airway disease or lower respiratory infection, probably viral. She also had bilateral otitis media.

5. On the next day, February 2, 1989, Amber was diagnosed as having bilateral otitis media and possible bilateral pneumonia.

6. By February 16, 1989, both the ear infections and the lung infection had resolved themselves.

7. Over a period of two or three weeks following recovery from the infections, Amber showed a change in responsiveness which caused her mother to be concerned that she might be suffering from a hearing problem. Amber also appeared to have lost her sense of equilibrium.

8. On March 27, 1989, Amber was diagnosed as having moderate to severe bilateral sensorineural hearing loss. A more recent evaluation shows a more severe hearing loss in both ears. The hearing loss is approximately symmetrical.

The Special Master set forth his sole legal conclusion as follows: "Petitioner is not entitled to an award of compensation under the Program."

As an initial matter, it should be noted that hearing loss is not one of the conditions or reactions listed in the Vaccine Injury Table, § 300aa–14. Therefore, the Vaccine Act requires the Special Master to apply a "preponderance of the evidence" standard to determine whether petitioner has established by sufficient evidence that the vaccine caused the injury suffered, in this case, the hearing loss. 42 U.S.C.A. § 300aa–13(a)(1)(A). If petitioner succeeds in establishing causation by a preponderance of the evidence, section 300aa–13(a)(1)(B) requires the Special Master to also determine that there is not a preponderance of the evidence showing that the injury was "due to factors unrelated to the administration of the vaccine." A subsequent provision explains that "factors unrelated to the administration of the vaccine" do not include any "idiopathic, unexplained, unknown, hypothetical, or undocumentable cause." § 300aa–13(a)(2)(A).

The "preponderance of the evidence" standard is the traditional standard of proof in civil and administrative proceedings. *Steadman v. SEC*, 450 U.S. 91, 101 n. 21, 101 S.Ct. 999, 1007 n. 21, 67 L.Ed.2d 69 (1981). In *Steadman,* the Supreme Court noted that "evidence ... of a poor quality—irrelevant, immaterial, unreliable and nonprobative—and of insufficient quantity—[is] less than a preponderance." *Steadman, supra,* 450 U.S. at 102, 101 S.Ct. at 1008. In *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), Justice Harlan explained that a preponderance of the evidence standard "requires the trier of fact 'to believe that the existence of a fact is more probable than its nonexistence before [the trier of fact] may find in favor of the party who has the burden to persuade the [judge] of the fact's existence.'" *In re Winship, supra,* 397 U.S. at 371, 90 S.Ct. at 1076 (Harlan, J., concurring) (quoting F. James, *Civil Procedure* 250–51 (1965)). The preponderance of the evidence standard has also been explained as "the greater weight of the evidence,

evidence which is more convincing than the evidence which is offered in opposition to it." *Hale v. Department of Transp., F.A.A.,* 772 F.2d 882, 885 (Fed.Cir.1985). Accordingly, as a corollary proposition, it follows that if the "evidence appears to be equally balanced, or if it cannot be said upon which side it weighs heavier, then plaintiff has not met his or her burden of proof." *Smith v. United States,* 557 F.Supp. 42, 51 (W.D.Ark.1982), *aff'd,* 726 F.2d 428 (8th Cir.1984). Based on the Special Master's fact findings set forth above, he determined that petitioner Melissa Hines had failed to establish by a preponderance of the evidence that the MMR vaccination caused Amber's hearing loss.

## II. Petitioner's Assignments of Error

■ Petitioner identifies some fifteen points of alleged error in the Special Master's decision, some of which are similar enough to be grouped together for discussion purposes. In her first assignment of error, petitioner alleges that the Special Master erred in asserting that "Petitioner's theory of the case is that 'Amber Sevier acquired measles from the vaccine, as evidenced by the rash on her bottom.' However, Petitioner did not rely on the rash as *the,* or even *an,* indication of causation." In her fourteenth assignment of error, petitioner complains that the "Special Master opined that Petitioner's theory of the case was that AMBER did acquire measles from the vaccine." Due to the similarity between these two assignments of error, they will be discussed together.

The opening statement of petitioner's counsel at the hearing before the Special Master indicates that petitioner's theory of the case, at least at the outset, appeared to be that the MMR vaccine can cause measles, that one of the known side effects of measles is nerve deafness, and that Amber's symptoms were measles symptoms. *See* Hearing Tr. at 9. After petitioner's expert medical witness, Dr. Dimitrov, testified that she would not have diagnosed Amber's symptoms as measles, and after Dr. Dimitrov testified that the timing and the type of hearing loss were the most important factors in reaching her conclu-

sion that the MMR shot caused Amber's injury, petitioner seemed to place more emphasis on those factors and less emphasis on the measles theory. From the state of the record it was not unreasonable for the Special Master to characterize petitioner's theory of the case as he did.

Petitioner's only expert witness at the hearing, Dr. Dimitrov, was retained less than one week before the hearing, since petitioner's original expert, Dr. Mokris, was unable to attend the hearing due to a family emergency. Parenthetically, if this presented a problem, it should be noted that petitioner never requested the Special Master to postpone the hearing. Dr. Dimitrov is an Assistant Professor at the University of Florida College of Medicine, where she is a board-certified Otolaryngologist (diseases of the ear, nose and throat). She is also a surgeon in her sub-specialty of neural otology (diseases of the hearing and balance). Dr. Dimitrov reviewed Amber's pre- and post-natal medical records, but she never examined or treated Amber. When asked by the Special Master to identify the sources from which Dr. Dimitrov had compiled notes in preparation for the hearing, Dr. Dimitrov stated that petitioner's counsel had provided her with some literature on immunizations and vaccines, including literature published for parents entitled "Healthy Kids," which reviewed the symptoms of measles. She also advised that she searched the literature in her office library through Medic Med-line Search (computer) to see if there were any reported cases of nerve deafness related to vaccine as opposed to the wild virus. Ostensibly, she found no reported cases as she mentioned none in her testimony. Petitioner did not provide Dr. Dimitrov with a copy of respondent's medical review.

Dr. Dimitrov testified that Amber's type of hearing loss is typical for measles, and that the appearance of a rash is not necessary in order to have measles. Dr. Dimitrov also testified that it was not necessary for her to conclude that Amber had the measles in order to conclude that the MMR vaccine caused Amber's hearing loss, but that it was "most likely that Amber had

the measles." Therefore, it was not unreasonable for the Special Master to conclude that petitioner represented, as one theory of the case, that Amber contracted the measles from the MMR shot, and that the measles caused her hearing loss. In any event, whether or not the Special Master stated correctly the precise nature of petitioner's theory or theories, it is clear that the Special Master carefully considered and discussed all of the facts and arguments presented to him before reaching a decision. In fact, the Special Master even considered mumps as an alternative cause of Amber's deafness, because he found some evidence in the record that nerve deafness has on occasion followed mumps vaccination, even though petitioner did not present an argument based on the theory that mumps caused Amber's deafness. Any error the Special Master may have made in stating petitioner's theory of the case would, in any event, be a harmless error under the circumstances. Even if the court assumes that the Special Master erroneously stated petitioner's theory of the case, any such error would not affect the outcome of the Special Master's decision. *See Smithkline Diagnostics, supra,* 859 F.2d at 892; *Sanders, supra,* 219 Ct.Cl. at 310, 594 F.2d at 818.

■ Petitioner's second assignment of error is that the Special Master erroneously concluded that "Dr. Dimitrov offered no support for her opinion that the vaccine caused Amber's deafness." Similarly, petitioner's fourth assignment of error observed that:

> [In his decision,] the Special Master continued his attack on the only medical expert at the hearing, stating that "Dr. Dimitrov's testimony is weakened further by her failure to cite any supporting authority for the proposition that the measles vaccine can cause hearing loss. She testified that she did some research to see if there were any reported cases of nerve deafness related to the vaccine as opposed to the virus, but she did not provide the results of that research."

It is to be noted that this excerpt from the Special Master's Decision is supported by the hearing transcript. Due to the similarity between these two assignments of error, they will be discussed together.

Dr. Dimitrov testified that bilateral sensorineural hearing loss is an adverse effect of measles and that it was "most likely" that Amber had the measles after the MMR shot. Dr. Dimitrov stated that it is extremely unlikely that chronic otitis media could have caused such a severe hearing loss. In concluding that Amber probably had the measles, Dr. Dimitrov relied on the timing of Amber's symptoms exhibited on February 1, 1989, six days after her MMR shot. The incubation period for measles when an MMR shot is given is forty-eight hours, according to Dr. Dimitrov. However, Dr. Dimitrov also admitted that, had she seen Amber's symptoms on February 1, 1989, including the rash on her bottom, Dr. Dimitrov probably would not have diagnosed the measles. Dr. Dimitrov explained that a rash from the measles is "diffuse" and would likely spread to most of the body. Also, a measles rash appears as raised red bumps, not as a blister-type rash. In addition, Dr. Dimitrov testified that it is possible, but extremely unlikely, that one could contract measles from the measles vaccine presently in use.

A review of the hearing transcript indicates that Dr. Dimitrov relied on a text entitled *Otolaryngology—Head and Neck Surgery* for the proposition that bilateral sensorineural hearing loss is a side effect of measles. Indeed, the Special Master acknowledged in his decision that "[t]here appears to be no dispute that infection by the wild virus of any of the three components of the MMR vaccine can cause deafness."[4] Dr. Dimitrov also relied on the otolaryngology text for the proposition that the hearing loss experienced by children with measles is usually permanent and may be accompanied by tinnitus (ringing in the ears) and vertigo (dizziness). The Special Master was correct in noting that Dr. Dimi-

---

**4.** It should be noted that the term "wild virus" as used in this case denotes a live virus that is transmitted by means other than vaccination.

The MMR vaccine contains a live but "attenuated" virus, that is, the ability of the virus to produce disease is reduced or weakened.

trov cited no documentation from authoritative medical literature to support the proposition that Amber's type of hearing loss can result from the MMR vaccine, only that it may result from the measles. Dr. Dimitrov relied mainly on her own medical expertise to conclude that Amber's hearing loss resulted from the MMR shot. However, the Special Master was not required to treat Dr. Dimitrov's testimony as conclusive on the issue of causation if he was unpersuaded by her testimony, as he clearly was. "Even uncontradicted opinion testimony is not conclusive if it is intrinsically unpersuasive." *Sternberger v. United States*, 185 Ct.Cl. 528, 535–36, 401 F.2d 1012, 1016–17 (1968); *Arundel Corp. v. United States*, 207 Ct.Cl. 84, 99, 515 F.2d 1116, 1124 (1975) (quoting *Sternberger*).

In addition, since the Special Master conducted the hearing, his decision as to how much weight to give expert testimony is entitled to substantial deference by the court. *See Exxon Corp. v. United States*, 19 Cl.Ct. 755, 761 (1990) (due regard shall be given to opportunity of trial court to judge credibility of witness); *Merchants Nat'l Bank v. United States*, 7 Cl.Ct. 1, 7 n. 4 (1984) (same). Although Dr. Dimitrov testified by telephone, and therefore the Special Master was unable to judge her appearance or demeanor, nevertheless he did have the opportunity to evaluate her credibility as he questioned her at length during the hearing. Too, the response to questioning reflected in the record also serves to manifest tonal quality and hesitancy in the telephonic recitation that are properly part of a credibility determination. Further, Dr. Dimitrov was engaged to serve as an expert in this case the week before the hearing at a period of time when she was involved in preparing for her wedding, an event that caused her testimony to be taken by telephone rather than in person. The hearing record indicates these factors impinged on the time available to her for preparation and study of the matters at issue.

Petitioner's third assignment of error is that the Special Master misstated the record in citing two factors which he found to weaken the opinion of Dr. Dimitrov as to causation. Petitioner identifies the first alleged misstatement as one appearing on page 6 of the Special Master's Decision, where he states that "Amber's hearing loss is symmetrical." [5] Petitioner finds this "misstatement" significant because Dr. Dimitrov testified that nerve deafness caused by the measles virus tends to be asymmetrical. According to the testimony of Dr. Dimitrov, Amber's hearing loss is "asymmetrical." However, Dr. Dimitrov did not provide a medical definition of "asymmetrical," and her testimony with regard to the meaning of "asymmetrical" is somewhat confusing. Although she agreed with the Special Master's attempt to define "asymmetrical" as a hearing loss that "affects both ears, but one [ear] more than the other," she also agreed with the Special Master's comment that "measles more typically affects both ears relatively equally." Thus, any confusion in this regard stems from the expert witness's equivocal and confusing testimony in this area.

In any event, the court need not decide whether the Special Master erred in finding that Amber's hearing loss is symmetrical, because the Special Master based his decision to deny compensation on many factors other than the "symmetry" of Amber's hearing loss. For instance, he found that Amber's symptoms on February 1, 1989 fell outside of the expected incubation period for measles, and that her symptoms were not suggestive of measles, but rather were symptoms of her ear infections and pneumonia from which she was suffering at the time. He also noted Amber's prior ear problems in August and November 1988, prior to administration of the MMR vaccine on January 26, 1989. The Special Master also found that Amber's hearing loss appeared to be progressive, which, he concluded from the record, is more suggestive of a congenital (hereditary) defect as a causative agent than measles. In addition,

5. Webster's New International Dictionary (2d ed. unabridged) contains the following medical definition of "symmetrical:" "affecting corresponding parts simultaneously and similarly."

the Special Master found that the medical testimony and medical literature presented by petitioner were insufficiently persuasive to show that nerve deafness is a possible consequence of the MMR vaccine. Finally, the Special Master was particularly troubled by the lack of medical evidence in the record linking the timing of the hearing loss with the MMR shot, as indicated in his decision: "To establish causation in fact one must prove more than proximate temporal association. 'Causation in fact requires proof of a logical sequence of cause and effect showing that the vaccination was the reason for the injury. A reputable medical or scientific explanation must support this logical sequence of cause and effect.'" Decision of Special Master, at 8 (quoting *Strother v. Secretary of Department of Health and Human Services*, 18 Cl.Ct. 816, 820 (1989)).

If the Special Master had based his decision that the MMR shot did not cause Amber's hearing loss solely on his factual finding that her hearing loss was symmetrical, and if that fact were found to be erroneous, then any such error might be a sufficient ground for reversal of his decision. However, the Special Master based his decision on a number of factors, cited above. Therefore, any error the Special Master may have made in finding that Amber's hearing loss was "symmetrical" is harmless, and would not change the outcome of his decision in the case. *See Smithkline Diagnostics, supra,* 859 F.2d at 892; *Sanders, supra,* 219 Ct.Cl. at 310, 594 F.2d at 818.

■ The Special Master's second alleged "misstatement" identified in petitioner's third assignment of error is that the Special Master noted in a footnote to his decision that "[a]nother factor which may indicate that Amber's learning [sic] loss was not caused by the vaccine is her loss of equilibrium." The record indicates that loss of balance is associated with congenital hearing problems rather than measles. Petitioner maintains that the medical text referred to by Dr. Dimitrov states that hearing loss in children with measles is usually permanent and may be accompa-

nied by vertigo (dizziness). Regardless of whether the court agrees with petitioner's attempt to equate loss of balance with vertigo, the Special Master indicated in his decision that, since Amber's balance problem had been resolved by her use of a hearing aid, the balance problem was not a factor he considered in reaching his decision. Moreover, petitioner has not shown that the Special Master did indeed consider Amber's balance problem in reaching his decision.

Petitioner's fourth assignment of error was discussed above in conjunction with petitioner's second assignment of error.

■ Petitioner's fifth assignment of error is that the Special Master's "claim that there is no literature which supports the Petitioner's position that an MMR vaccination can result in hearing loss is directly contradicted by the only evidence in the record." Petitioner complained that the Special Master characterized the literature submitted by petitioner from the State of Florida Health Department as "equivocating." The court finds the Special Master's characterization of the article to be accurate in this regard, and he was entitled to give it little weight. Indeed, the language of the document cautiously states that "although experts are not sure, it seems that very rarely children who get [MMR] vaccines may have a more serious reaction, such as ... nerve deafness." Another article submitted by petitioner states that "rarely children who get these vaccines have a more serious reaction, such as encephalitis, convulsions with fever, or nerve deafness." The Special Master was entitled to give this article little weight as well, especially since, as he noted, it was not written by a medical expert. In addition, petitioner argues that the Special Master ignored a Department of Health and Human Services publication entitled "Morbidity and Mortality Weekly Report," which states that one of the known side effects of the mumps vaccine is unilateral nerve deafness within thirty days of immunization. Since Amber suffers from bilateral nerve deafness, as the Special Master found, the

Special Master was entitled to accord this article little or no weight.

Although petitioner argues that this case is one of the extremely rare occasions where the MMR vaccine caused nerve deafness, petitioner's expert Dr. Dimitrov also testified that chronic otitis media can, in rare instances, cause a severe hearing loss such as Amber's. It should be noted in this regard that the record shows Amber suffered at least three bouts of otitis media before the January 26, 1989 MMR shot. The Special Master's conclusion that no authoritative medical literature supports petitioner's position that the MMR vaccine can cause bilateral sensorineural hearing loss is supported by the record.[6]

■ Petitioner's sixth assignment of error is that "the Special Master supported his denial of compensation by placing particular emphasis on the temporal relationship between the inoculation and the onset of the hearing loss. However, the testimony presented at the hearing did nothing to cast doubt on this causal relationship." Petitioner's seventh assignment of error is "the Special Master's persistence in attacking the temporal relationship of the deafness to the inoculation [as] demonstrated by his discussion of Petitioner's expert's testimony." Due to the similarity between these two assignments of error, they will be discussed together.

The hearing transcript indicates that there was some confusion regarding the differing incubation periods for the onset of measles when contracted from a wild virus, and when contracted from an MMR vaccination. In his decision, the Special Master concluded that Dr. Dimitrov did not know the incubation period for measles. The hearing transcript indicates that, when first questioned by the Special Master, Dr. Dimitrov testified that she did not know the incubation period for measles. Later in the hearing, Dr. Dimitrov testified, albeit vaguely, that the incubation period for the

wild virus is less than one week, and that the incubation period is forty-eight hours for the MMR vaccine. In his decision, the Special Master found that the incubation period for measles contracted from the wild virus is ten to twelve days, and the incubation period for the rash and fever that may follow an MMR shot is six to fourteen days, citing a pediatrics textbook and a document submitted by petitioner that was ostensibly produced by the State of Florida Department of Health and Rehabilitative Services.

Petitioner complains that the Special Master committed procedural error by consulting a pediatrics textbook outside the record to determine incubation periods. However, the Special Master was not required to accept without question Dr. Dimitrov's subsequent testimony with regard to incubation periods that contradicted her earlier testimony that she did not know the incubation period for measles. "Even uncontradicted opinion testimony is not conclusive if it is intrinsically nonpersuasive." *Sternberger, supra*, 185 Ct.Cl. at 535–36, 401 F.2d at 1016–17. Accordingly, since the Special Master was not inclined to accept Dr. Dimitrov's equivocal testimony on the incubation period of measles, he was not precluded from seeking further substantiation of a medical fact, such as the incubation period of measles. Amber's high fever, diaper rash and other symptoms were medically documented on February 1, 1989, six days after her MMR shot, which falls on the borderline of the 6 to 14 day time period for a reaction to the vaccine, according to the medical textbook consulted by the Special Master. In contrast, Dr. Dimitrov testified that such symptoms should appear within forty-eight hours, and she provided no information on the outer limit of the incubation period. Thus, Amber's symptoms may or may not have fallen within the incubation period set forth by Dr. Dimitrov, although Dr. Dimitrov con-

6. The record indicates that the Special Master went out of his way to locate and consider a medical article that petitioner was unable to locate. The article discussed a case where nerve deafness followed an MMR vaccination. However, the Special Master found the article unpersuasive because the patient's nerve deafness was preceded by an encephalitis reaction, the patient had a family history of nerve deafness, and the article did not conclude that the MMR vaccine caused the nerve deafness.

**645**

cluded that the timing of Amber's symptoms fell within the incubation period. Under the circumstances, considering Amber's prior history of ear infections, the time frame and the type of symptoms she displayed on February 1, which were later diagnosed as bilateral otitis media and pneumonia, the Special Master did not err in finding that petitioner failed to prove by a preponderance of the evidence that the symptoms displayed by Amber on February 1, 1989 were related to the MMR shot.[7]

■ Petitioner's eighth assignment of error is that "the Special Master went to extraordinary lengths to support his assertion that AMBER's deafness did not follow the measles inoculation. He claimed: 'there is no substantial evidence that Amber contracted measles. Petitioner relied on the rash on her bottom as evidence that she had contracted measles.'" Dr. Dimitrov testified at the hearing that the type of symptoms reported by the hospital emergency room on February 1, 1989 are "comparable" to measles symptoms. However, when quizzed by the Special Master about the incubation period of measles resulting from the MMR vaccine, Dr. Dimitrov was equivocal about the relationship between Amber's symptoms and the measles. Indeed, Dr. Dimitrov admitted that she probably would not have diagnosed Amber's symptoms on February 1 as measles. In response to the Special Master's questioning, Dr. Dimitrov also testified that measles can cause both pneumonia and otitis media. The record shows that Amber was diagnosed with both pneumonia and bilateral otitis media on February 2, 1989. The record reflects the inconsistent and equivocal nature of Dr. Dimitrov's testimony with regard to the relationship between the symptoms and the measles, and the rela-

tionship between the symptoms and the vaccine. In light of this conflicting testimony, the Special Master was entitled to conclude, as he did, that the record does not support a finding that Amber contracted measles from the MMR shot.

■ Petitioner's ninth assignment of error is that the Special Master erred in failing to accord sufficient weight to the affidavit of petitioner's expert medical witness Dr. Michael Mokris, who was unable to testify in person at the hearing due to a family emergency. Petitioner complains that

> the Special Master effectively ignored Dr. Mokris' testimony, because this expert for the Petitioner was unable to attend the hearing in person [and the Special Master] accorded much greater deference to Respondent's doctor's submitted written review. It was made part of the record, although it had not been timely filed and [the Special Master] referred to it repeatedly while cross-examining Dr. Dimitrov.

By contending that respondent's medical review was not timely filed, petitioner is apparently referring to the time frame set forth in Rule 4(b) of the Vaccine Rules (RUSCC—Appendix J), which provides that respondent must file a report setting forth its position within ninety days from the date the petition was filed. Since the petition was filed August 28, 1989, it follows that respondent's medical review, filed March 30, 1990, was indeed outside the time period provided in Rule 4. However, the Vaccine Act itself directs the court to promulgate vaccine rules that provide for "flexible and informal standards of admissibility of evidence." 42 U.S.C.A. § 300aa–12(d)(2)(B). In conjunction therewith, Vaccine Rule 8(b) provides that "[t]he

---

**7.** Petitioner attempts to support her argument that the Special Master erred in finding no causal connection between the MMR vaccination and Amber's hearing loss by referring to another Vaccine Act case, *Reddish v. Secretary of Dep't of Health and Human Servs.*, 18 Cl.Ct. 366 (1989). In *Reddish,* the Claims Court upheld an uncontested Special Master's decision to award compensation for a sensorineural hearing loss that was found to be causally related to an MMR vaccination. Petitioner's reliance on *Red-*

dish is misplaced, however, as *Reddish* is distinguishable in many respects. For example, in *Reddish,* the child experienced a profound and stable hearing loss within twenty-four hours of receiving the MMR vaccination, with no other health problems at the time, unlike the present case. In addition, the Special Master in *Reddish* found the medical records and the medical testimony of petitioner's experts to be highly persuasive, unlike the present case.

special master will consider all relevant, reliable evidence, governed by principles of fundamental fairness to both parties."

Presumably guided by these rules, the Special Master allowed respondent to file its medical review, even though it was outside the time period of Rule 4. The filing took place some twenty-five days prior to the hearing, which would appear to give petitioner sufficient time to prepare a rebuttal to respondent's seven-page medical review. Indeed, petitioner commented on the merits of respondent's medical review at the hearing. Moreover, the Special Master warned petitioner's counsel at the beginning of the hearing that the Special Master was going to consider respondent's medical review as part of the record in the case. Petitioner made no objection in this regard. Thus, the court does not find the Special Master's action in allowing respondent to file its medical review outside the time period provided by the Vaccine Rules to be fundamentally unfair to petitioner.

■ The hearing transcript indicates that Dr. Mokris was unable to testify in person due to a family emergency, and that Dr. Dimitrov was retained, at significant personal inconvenience, as a substitute less than one week before the date of the hearing. As indicated earlier, petitioner never sought a postponement of the scheduled hearing because of Dr. Mokris' unavailability. Dr. Mokris' affidavit states that he specializes in pediatric and adult ear, nose and throat medicine and surgery. According to Dr. Mokris, by February 6, 1989, Amber showed signs of hearing loss. He tested Amber for hearing loss on May 4, 1989, and found that Amber has suffered a moderate to severe hearing loss or nerve deafness. Because of Amber's medical history and due to the timing of her hearing loss, it is Dr. Mokris' opinion, "within a reasonable degree of medical probability, that Amber Sevier's hearing loss was caused by an adverse reaction to the

M.M.R. vaccination which Amber Sevier received on January 26, 1989." Dr. Mokris' affidavit does not identify any additional facts to support his medical opinion. Accordingly, the Special Master was correct in finding Dr. Mokris' affidavit to be conclusory in nature, and that factor, coupled with Dr. Mokris' unavailability for examination by the Special Master, constitutes sufficient reason for the Special Master to give his opinion little weight.[8] Moreover, the Special Master warned petitioner's counsel at the hearing that Dr. Mokris' affidavit would be given less weight than if he were to testify in person, and counsel raised no objection, and in fact replied "I understand."

Petitioner's argument that the Special Master accorded too much weight to respondent's medical review is similarly without merit. The Special Master has discretion to determine the proper weight to accord respondent's medical review. Based on the few instances he referred to the medical review in his decision, there is no basis for the court to conclude that the Special Master abused his discretion in dealing with the medical review. Petitioner raised no objection to the filing of the review as untimely. Moreover, the hearing did not take place until April 25, 1989, which gave petitioner adequate time to prepare a rebuttal to the evidence contained in respondent's medical review, as evidenced by the hearing transcript. Indeed, as noted above, petitioner at the hearing commented on the merits of the medical review.

■ Petitioner's tenth assignment of error is that the

Special Master once again ignored the RUSCC and the [Vaccine] Guidelines' requirement to ensure fairness and "creat[e] a complete and orderly record," by looking outside the record to support his Decision. He gave great weight to some book on pediatrics, citing it repeatedly, although this book was not

---

**8.** In an earlier vaccine case, *Pusateri v. Secretary of Department of Health and Human Services*, 18 Cl.Ct. 828, 831 (1989), the Claims Court gave little consideration to a similarly conclusory affidavit with regard to attorney's fees. The court characterized the affidavit as a "general-

ized and conclusory 'information and belief' affidavit." *See also Flaherty v. United States*, 222 Ct.Cl. 15, 21 n. 7, 610 F.2d 756, 759 n. 7 (1979) (undetailed and conclusory affidavit can be given little or no weight on motion for summary judgment).

part of the evidentiary record. Consequently, counsel for Plaintiff was unable to cross-examine *anyone* on its authoritativeness, accuracy or acceptance by the medical community. (Emphasis added by petitioner.)

Petitioner makes no attempt in her motion for review to discredit the authoritativeness of the textbook the Special Master consulted, nor does petitioner attempt to rebut the data on incubation periods contained therein. Petitioner merely complains that she was unable to conduct a cross-examination at the hearing with regard to the authoritativeness of the textbook.

The decision of the Special Master indicates that he was not impressed by the testimony of Dr. Dimitrov, particularly with regard to her testimony concerning the incubation period of measles. Therefore, the Special Master consulted an outside source for further information regarding the incubation period of measles. By consulting a pediatrics textbook, the Special Master found that the incubation period for the wild measles virus is ten to twelve days, and that the incubation period for the side effects that may follow the MMR vaccination is six to fourteen days. In contrast, Dr. Dimitrov testified that the incubation period for measles contracted from the wild measles virus is "less than one week," and the incubation period for measles contracted from the MMR vaccine is "within forty-eight hours."

There is nothing in the Vaccine Rules or the Vaccine Act to indicate that the Special Master is bound by formal evidentiary rules that govern the consideration of evidence in federal trial courts. In fact, the Vaccine Act provides that the Vaccine Rules promulgated by the court should include provisions for "flexible and informal standards of admissibility of evidence." 42 U.S.C.A. § 300aa–12(d)(2)(B). In conjunction therewith, Vaccine Rule 8(b) states that, "[i]n receiving evidence, the special master will not be bound by common law or statutory rules of evidence," but rather he should "consider all relevant, reliable evidence, governed by principles of fundamental fairness to both parties." In a vaccine case decided before the Vaccine Act amendments were enacted in December 1989, the Claims Court found that, based on the provisions of the Vaccine Act, the Special Master is not constrained in developing the record by the Federal Rules of Evidence. *See Davis v. Secretary of Dep't of Health and Human Servs.*, 19 Cl.Ct. 134, 139 (1989) (Special Master's fact-finding mission is not limited by formal evidentiary rules). The hearing reflects the flexible nature of Vaccine Act proceedings involving petitioner's case. *See* Hearing Tr. at 46–47.

Even if the Special Master were constrained by the federal rules, however, his consultation of a medical textbook would likely pass muster under Federal Rule of Evidence 201, which gives the court discretion to take judicial notice of adjudicative facts. An adjudicative fact is one not subject to reasonable dispute because it is capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. Fed.R.Evid. 201(a)–(c). In addition, the court may take judicial notice at any stage of the proceedings. Fed.R.Evid. 201(f). Therefore, the Special Master's action in taking judicial notice of an adjudicative fact, such as the incubation period of measles, by consulting a medical textbook after the hearing, passes muster under the lenient evidentiary rules of the Vaccine Act. Moreover, although the Federal Rules of Evidence do not constrain the Special Master in Vaccine Act proceedings, his action in consulting medical literature other than that relied upon by the parties does not appear to conflict with the more stringent requirements of the Federal Rules of Evidence.[9]

9. Under Federal Rule of Evidence 201, judicial notice of adjudicative facts applies to self-evident truths, including medical facts, that no reasonable person could question. *See Hardy v. Johns–Manville Sales Corp.*, 681 F.2d 334, 347 (5th Cir.1982). The incubation period of measles appears to fall within the purview of an adjudicative fact subject to judicial notice.

The Special Master relied on a medical textbook identified as *Nelson Textbook of Pediatrics*, 13th ed. 1987, by Behrman and Vaughn. The Supreme Court of North Carolina recognized

Furthermore, the Special Master was not obligated to accept the testimony of petitioner's expert witness if he felt it was unpersuasive, which he clearly did since his decision stated that Dr. Dimitrov did not know the incubation period for measles. "Even uncontradicted opinion testimony is not conclusive if it is intrinsically nonpersuasive." *Sternberger, supra,* 185 Ct.Cl. at 535–36, 401 F.2d at 1016–17; *Arundel Corp., supra,* 207 Ct.Cl. at 99, 515 F.2d at 1124 (quoting *Sternberger* ).

■ Petitioner's eleventh assignment of error is that "the Special Master mischaracterized crucial testimony ... [by] repeatedly attempt[ing] to characterize AMBER's hearing loss as progressive, thereby lending support to his denial of compensation (because Dr. Dimitrov testified that vaccine-related hearing loss would be stable)." Petitioner's twelfth assignment of error is that "the Special Master asserts that AMBER's hearing has worsened [and] the Special Master cites no evidence for this assertion." Due to the similarity between these two assignments of error, they will be considered together. Petitioner's objections are aimed at the Special Master's eighth finding of fact, in which he finds that Amber's first hearing test in March of 1989 indicated a "moderate to severe bilateral sensorineural hearing loss," and that "a more recent evaluation shows a more severe hearing loss in both ears."

The record indicates that Amber's first hearing test occurred on March 27, 1989 at the pediatric clinic in Orange County, Florida. The first test indicated that Amber had a moderate to severe bilateral sensorineural hearing loss in her left ear, and a profound sensorineural hearing loss in her right ear. A second test in Orlando, Florida in April 1989 reflected a "mild sloping to profound sensorineural hearing loss" of sixty-five decibels in Amber's left ear, and a profound hearing loss of fifty-five decibels in her right ear. Amber's hearing was tested again on May 22, 1989, per order of Dr. Mokris, which revealed a ninety decibel loss in her right ear, and a sixty-six decibel loss in her left ear. On July 20, 1989, Amber's hearing was tested by Dr. Marlowe, which indicated an eighty decibel loss in the right ear, and a sixty decibel loss in the left ear. On November 18, 1989, Amber's medical history was reviewed at the Beaumont State Center in Texas. The medical evaluation stated that Amber was "totally deaf in the right ear and had only five percent hearing in the left ear." Apparently the Special Master relied on the Beaumont records in concluding that Amber's hearing has deteriorated to a ninety-five percent loss in the left ear and a ninety-nine percent loss in the right ear.

In addition, the Special Master found that Amber's mother and grandmother noticed a gradual change in Amber's responsiveness, which could indicate a progressive, rather than a sudden, hearing loss. Petitioner argues that the testimony of Amber's mother and grandmother indicates that they were slow to recognize Amber's hearing loss, not that the hearing loss was slow to develop. A review of the hearing transcript indicates that the Special Master actively cross-examined Amber's mother and grandmother and that he accurately characterized their testimony as suggesting a progressive hearing loss. The Special Master is not required to be a "potted plant" at the hearing, as petitioner seems to suggest. Rather, the legislative history of the newly-amended Vaccine Act emphasizes that "[t]he system is intended to allow the proceedings to be conducted in ... an 'inquisitorial' format, with the [special] master conducting discovery (as needed), cross-examination (as needed) and investi-

Nelson's Textbook of Pediatrics as a standard textbook in that field of medicine. *See Koury v. Follo,* 272 N.C. 366, 370, 158 S.E.2d 548, 552 (1968). *See also Marquardt Co. v. United States,* 822 F.2d 1573, 1578 (Fed.Cir.1987) (court can take judicial notice of accounting texts); *Urbanek v. United States,* 731 F.2d 870, 873 n. 3 (Fed.Cir.), *cert. denied,* 469 U.S. 1034, 105 S.Ct. 508, 83 L.Ed.2d 398 (1984) (same).

It should also be noted that Federal Rule of Evidence 803(18) contains a hearsay exception for statements contained in learned treatises, when the statements are called to the attention of an expert witness during cross-examination, or are relied upon by him during direct examination, if the treatise is established as a reliable authority by, *inter alia,* judicial notice.

gation." 135 Cong.Rec. H9476 (daily ed. Nov. 21, 1989). Moreover, at the hearing petitioner made little or no effort to rebut the inference that Amber's hearing loss was progressive. The testimony of Dr. Dimitrov was not helpful in this regard. The hearing transcript indicates that Dr. Dimitrov may not have had adequate time to thoroughly review Amber's medical records before the hearing took place. For example, Dr. Dimitrov testified that she was unaware that Amber's subsequent hearing tests indicated a deterioration in her hearing ability, and that this factor might cause Dr. Dimitrov to suspect some other cause of Amber's hearing loss besides measles or mumps. In an effort to minimize the impact of this testimony, petitioner thereafter sought to impugn the integrity of the audiograms she offered in evidence by raising the "possibility" that the audiograms may have reflected discrepancies that were due to factors other than an accurate reflection of a progressive hearing loss. On this record such an effort is mere speculation and conjecture. In light of the conflicting evidence before him, the Special Master's conclusion that Amber suffered a gradual and progressive hearing loss is not unreasonable, and was clearly supported by medical records and the testimony of Amber's mother and grandmother.

 Petitioner's thirteenth assignment of error is that "the Special Master, in his continual attempt to minimize Dr. Dimitrov's testimony, quoted her as saying that there was no way that she could 'prove' causation." In his decision, the Special Master correctly quoted Dr. Dimitrov's testimony that it was "highly likely due to the timing and the appearance of the hearing loss that this could have been caused by the vaccine. There is absolutely no way I can prove this, but it is highly likely that it was due to the vaccine." Petitioner essentially argues that the Special Master has confused actual proof, to which Dr. Dimitrov referred in the above quote, with the legal standard of proof contained in the Vaccine Act, which requires petitioner to prove that the vaccine caused the injury by a preponderance of the evidence. There is no indication in the record, however, that

the Special Master took Dr. Dimitrov's testimony to mean that, in her expert medical opinion, the vaccine did not cause Amber's deafness. The fact that the Special Master found the evidence did not support the doctor's opinion does not warrant a conclusion that the Special Master did not understand or apply the correct standard of proof. The record supports the conclusion that the Special Master did indeed correctly apply the preponderance of the evidence standard to find that petitioner had failed to prove that the MMR vaccine caused Amber's hearing loss.

Petitioner's fourteenth assignment of error was discussed above in conjunction with petitioner's first assignment of error.

 Finally, petitioner's fifteenth assignment of error is that "the Special Master allegedly denied compensation because he was 'unable to determine the cause of the nerve deafness' and there was 'not a preponderance of the evidence showing the specific cause of Amber's hearing loss.' This assertion is contradicted by the record." Petitioner reads the Special Master's decision as placing too much reliance on respondent's position as stated in the medical review. Petitioner highlights several points in respondent's review which are allegedly refuted by petitioner's evidence, and which the Special Master allegedly ignored. Specifically, petitioner argues that the testimony at the hearing clearly refutes the possibility of a family history of hearing or kidney disorders raised in respondent's review. Although the hearing transcript supports petitioner's position in this regard, there is no indication that the Special Master considered this factor at all in reaching his decision, much less any indication that he relied on respondent's position.

The medical review also raises the possibility of neurologic abnormalities, which petitioner refutes by pointing to Amber's neurological examination at the Beaumont State Center, which revealed only her hearing loss. Although the record indicates that petitioner is again correct in this regard, there is no indication that the Special

Master considered this factor or that he relied on respondent's position in reaching his decision.

Respondent's medical review also concludes that Amber had no speaking ability at age fifteen months when she received the MMR vaccination. Petitioner accurately refutes this conclusion by pointing to the testimony of Amber's mother and her babysitter that Amber could speak several words before the date of her MMR shot. In his decision, the Special Master found that Amber had a six-word vocabulary prior to her MMR vaccination, which clearly indicates that the Special Master did not rely on respondent's position in reaching his decision.

In addition, respondent's medical review concludes that Amber showed signs of mycoplasma or adenovirus infection on February 1, 1989, either of which, respondent alleges, could be a causative agent of deafness. Petitioner refutes the contention that adenovirus or mycoplasma could be a causative agent of Amber's deafness by pointing to Dr. Dimitrov's testimony that she was unaware that mycoplasma could cause deafness, and while she admits adenovirus could be a causative agent of deafness, she contends that it is even more rare than measles or mumps as a causative agent. The Special Master did not rely on respondent's suggestions as to possible alternative causes of Amber's deafness. Instead, the Special Master concluded that Amber's hearing loss is idiopathic, that is, he was unable to determine the cause.[10]

Finally, petitioner disagrees with respondent's conclusions in the medical review

that the onset of Amber's deafness cannot be determined, that nothing in the record indicates that Amber had an acute vaccine-related illness within the expected time frame, and that current medical literature does not accept a causal relationship between hearing loss and the MMR vaccine. These arguments embrace the ultimate legal issue in the case, that is, whether the MMR vaccine caused Amber's hearing loss, and they have all been discussed above in the context of petitioner's assignments of error in the Special Master's decision.

The court finds none of the factual findings of the Special Master stated above, nor any of the factual findings with which petitioner takes issue in her motion for review, to be arbitrary, capricious or an abuse of discretion. The court finds the Special Master's factual findings to be supported by substantial evidence in the record, taking into account the evidence in the record that detracts from its weight. On the record as a whole, the court is not left with a definite and firm conviction that a mistake has been made.

The Special Master reached only one legal conclusion: that petitioner is not entitled to an award of compensation under the Vaccine Compensation Injury Program. For the foregoing reasons, the court finds this legal conclusion to be in accordance with law. The Special Master correctly applied the preponderance of the evidence standard in reaching his decision. Based on the record before him, the Special Master committed no error of law in determining that petitioner had not shown causation by a preponderance of the evidence, that is,

---

10. As discussed *supra,* the Vaccine Act sets forth, in two steps, the requirements for a determination as to eligibility for compensation. *See* § 300aa–13(a)(1)(A) & (B). In this case, the Special Master concluded that petitioner failed to meet the criteria of step one when he determined that petitioner had failed to prove by a preponderance of the evidence that the MMR vaccine caused Amber's hearing loss. Therefore, it was unnecessary for the Special Master to proceed to step two of the inquiry, which requires petitioner to also show that there is not a preponderance of the evidence that the injury is due to factors unrelated to the administration of the vaccine. Section 300aa–13(a)(2) explains that "factors unrelated to the administration of

the vaccine" do not include any "idiopathic, unexplained [or] unknown cause...." Since the Special Master did not reach the step two inquiry because petitioner failed to meet the step one causation requirement, the Special Master's conclusion that Amber's hearing loss is "idiopathic," i.e., its cause cannot be determined, is not in conflict with section 300aa–13(a)(1) & (2). Interestingly, petitioner's expert agreed with the statement in the government's medical review report, which was submitted to the Special Master, that "the cause of sensorineural hearing loss is frequently idiopathic, that is no cause is ever determined." (Tr. 83). Amber's hearing loss was sensorineural.

petitioner did not prove that it was more likely than not that the MMR vaccine caused Amber's hearing loss. *See In re Winship, supra,* 397 U.S. at 371, 90 S.Ct. at 1076.

After a careful review of the record in this case, the court finds that the Special Master's legal conclusion that petitioner is not entitled to compensation is "in accordance with law," that is, it is in accordance with the "preponderance of the evidence" standard of proof set forth in the Vaccine Act. The Special Master found that petitioner's evidence was insufficient to establish by a preponderance of the evidence that the MMR vaccine caused Amber's hearing loss. It is apparent from the Special Master's decision that he found the testimony of petitioner's expert medical witness Dr. Dimitrov to be unpersuasive, equivocal and confusing. Moreover, the Special Master found the medical literature supplied by petitioner to be unpersuasive and equivocal with regard to establishing a nexus between the MMR vaccine and Amber's bilateral sensorineural hearing loss. On the whole, it is clear that the Special Master was unpersuaded by the evidence that it was more likely that the MMR vaccine caused Amber's hearing loss than other possible causes, such as Amber's ear infections and other illnesses, or a congenital hearing problem.[11] For these reasons, the court finds that the Special Master's legal conclusion that petitioner is not entitled to compensation is in accordance with law, as it is based on findings of fact that are neither arbitrary, capricious, nor an abuse of discretion.

## CONCLUSION

For the foregoing reasons, the court upholds the Special Master's findings of fact and conclusion of law in this case, and the court sustains the Special Master's decision to dismiss petitioner Melissa Hines' petition for compensation under the Vaccine Act.

The Clerk is directed to dismiss petitioner's petition. No costs.

---

**11.** The court feels that a significant amount of respect must be accorded to the Special Master's expertise, which he has developed through hearing and deciding vaccine cases on a daily basis. *See Munn v. Secretary of Dep't of Health and Human Servs.,* 21 Cl.Ct. 345, 348 (1990); *Win-* *ston Bros. Co. v. United States,* 198 Ct.Cl. 37, 47, 458 F.2d 49, 54 (1972) (Court of Claims not bound by legal interpretations of Contract Appeal Boards, but court will accord them great respect as emanating from a source having expertise).